**Sentencing Submission On Behalf Of Andrew Caspersen**

**16-CR-00414-JSR**

# BRACEWELL

**Texas**          Paul Shechtman
**New York**       Partner
**Washington, DC**
**Connecticut**    +1.212.508.6107 Office
**Seattle**        +1.800.404.3970 Fax
**Dubai**
**London**         Paul.Shechtman@bracewelllaw.com

Bracewell LLP
1251 Avenue of the Americas
49th Floor
New York, New York
10020-1100

October 20, 2016

VIA ECF & MESSENGER

Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:   United States v. Andrew Caspersen, 16-CR-00414-JSR

Dear Judge Rakoff:

This letter is respectfully submitted on behalf of Andrew Caspersen, who is scheduled to be sentenced by the Court on November 2, 2016, for securities and wire fraud offenses that resulted in losses of more than $36 million. As the Court knows, justice requires a sentencing judge to take account of human frailties and to exercise moral judgment. See Koon v. United States, 518 U.S. 81, 113 (1996)(reminding that the "uniform and constant . . . tradition for the sentencing judge is to consider . . . every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue"). In this case, there are powerful mitigating circumstances that warrant leniency for a good man whose mental illness -- a pathological gambling disorder -- fueled his crimes.

**BRACEWELL**

October 20, 2016
Page 2

A.    <u>Pathological Gambling</u>

We begin with a discussion of pathological gambling and Mr. Caspersen's gambling history to try to explain how so talented and admired a person could commit such crimes.[1]

Until the 1980s, compulsive gambling was typically viewed as a moral failing. George Washington's words were often invoked:  "gambling is the child of avarice . . . and the father of mischief."   Letter of Jan. 15, 1783, quoted in American Heritage Dictionary of Questions 207.  Freudians believed that compulsive gamblers lusted for punishment, knowing that losing was guaranteed by the game's unfavorable odds.  <u>See</u> E. Bergler, The Psychology of Gambling (1954).   In 1980, the American Psychiatric Association ("APA") recognized pathological gambling as a mental disorder, classifying it as an "impulse control disorder."  <u>See</u> APA Diagnostic and Statistical Manual of Mental Disorders 324 (3d ed. 1980)("DSM-III").  In 2013, the APA reclassified it as an addiction-related disorder, reflecting the substantial body of research showing that pathological gambling and substance addiction affect similar areas of the brain in similar ways.  <u>See</u> DSM-5 at 585 (5th ed. 2013).

A recent article reports this:

> Brain imaging and neurochemical tests have made a "pretty strong case that [gambling] activates the reward system in much the same way that a drug does." . . . .  Gamblers report craving and highs in response to their stimulus of choice . . . .   Research has shown that problem casino gamblers show increases in heart rate and salivary stress hormones as well as blood levels of norepinephrine compared with non-problem gamblers.   The former also show increases in dopamine, the key player in the brain's "reward circuit."   [Moreover,] brain-

---

[1]    We recognize that the Court is likely familiar with the neuroscience literature discussed in this section.  <u>See</u> Rakoff, A Judge's Guide to Neuroscience:  A Concise Introduction (2010).

BRACEWELL

October 20, 2016
Page 3

imaging studies show that when exposed to gambling videos, problem gamblers'
brains show "important similarities" to changes in the brains of cocaine addicts
when viewing a video about cocaine.

C. Holden, Behavior Addictions Debut in Proposed DSM-V, SCIENCE, February 2010 at 935;

see generally Nat. Ctr. for Responsible Gaming, Gambling and the Brain:  Why Neuroscience

Research is Vital to Gambling Research (2011).   In short, pathological gambling "has been

conceptualized as an 'addiction without the drug.'"  Letter of Dr. Marc Potenza.[2]

The DSM-5 defines gambling disorder as "persistent and recurrent problematic
gambling behavior leading to clinically significant impairment or distress."   Among its
characteristics are:  (i) preoccupation with gambling; (ii) chasing one's losses (gambling more
money on more risky bets in an effort to recoup losses); (iii) lying to conceal the extent of
gambling; (iv) jeopardizing one's job or career opportunity; and (v) relying on others to provide
money to relieve desperate financial situations caused by gambling.  Id.  The authors write this:

> The essential feature of gambling disorder is persistent and recurrent maladaptive
> gambling behavior that disrupts personal, family, and/or vocational pursuits . . . .
> A pattern of "chasing one's losses" may develop, with an urgent need to keep
> gambling (often with the placing of larger bets or the taking of greater risks) to
> undo a loss or series of losses . . . .  Although many gamblers may "chase" for
> short periods of time, it is the frequent, and often long-term, "chase" that is
> characteristic of gambling disorder . . . .  Individuals may lie to family members,
> therapists, or others to conceal the extent of involvement with gambling; these
> instances of deceit may also include, but are not limited to, covering up illegal
> behaviors such as forgery, fraud, theft, or embezzlement to obtain money with
> which to gamble . . . .  Individuals may also engage in "bailout" behavior, turning
> to family or others for help with a desperate financial situation that was caused by
> gambling.

---

[2]      Dr. Potenza is a Professor of Psychiatry at the Yale University School of Medicine and a
leading expert on pathological gambling.  His letter to the Court providing "his expert opinion
regarding gambling disorders and how they relate to Mr. Caspersen" is attached as Appendix C.
A bibliography for the letter is available at the Court's request.

BRACEWELL

October 20, 2016
Page 4

Id. at 586.   Gambling patterns "may be regular or episodic and gambling disorder can be persistent or in remission," but it is typically a progressive disease.  Id. at 587.

The stages of gambling disorder have been described this way.  The first stage, progression, is when the gambler is unable to stop gambling.  He must spend more time and money gambling in an effort to achieve the same excitement.  In the second phase, intolerance, the gambler starts to hide the amount and frequency of his loss, and experiences nearly uncontrollable urges to gamble to win back lost money.  The third stage, preoccupation, is characterized by continuous obsessive thoughts of gambling and the belief that gambling will solve all problems.  In the final stage, disregard for consequences, the gambler remains convinced that a "big win" will solve all problems, and disregards the negative consequences of his gambling, often engaging in illegal activities such as forgery, theft, and embezzlement.  See Darren Gowen & Jerri B. Speyerer, Compulsive Gambling and the Criminal Offender:   A Treatment and Supervision Approach, 59 Fed. Prob. 36, 36-37 (Sept. 1995).[3]

---

[3]   Studies find a high correlation between severe pathological gambling (8 to 10 DSM-IV symptoms) and illegal activity.  See M. Toce-Gerstein, et al., A Hierarchy of Gambling Disorder in the Community, 98 Addiction 9661 (2003)(more than 60 percent correlation); see also M. Potenza, et al., Illegal Behaviors in Problem Gambling:  Analysis of Data from a Gambling Helpline, 28 J. Am. Acad. Psychiatry & L. 389 (2000)("these findings suggest that the gamblers with [illegal conduct] constitute a subgroup with more severe gambling-related pathology").  In the DSM-IV, there was a separate diagnostic criterion for "has committed illegal acts such as forgery, fraud, theft or embezzlement to finance gambling."  DSM-V removed the criterion because it "appear[ed] to add little to diagnostic accuracy."  N. Petry el al., Changes Proposed for Pathological Gambling in DSM-5, 3 (2014).  That committing illegal acts is no longer a stand-alone diagnostic criterion does not alter the fact that illegal acts are highly correlated with "the most severe form" of the disorder.  Id.  "[S]tealing reflects the desperation that can occur in the context of this disorder."  Id.

BRACEWELL

October 20, 2016
Page 5

Prior to November 1, 2003, several courts found that "a pathological gambling disorder, if proven . . . to have resulted in a significantly reduced mental capacity contributing to the commission of the offense of conviction, [could] qualify . . . as a form of 'diminished capacity' under §5K2.13," and warrant a downward departure.  United States v. Harris, 1994 WL 683429, at *4 (S.D.N.Y. Dec. 6, 1994)(collecting cases).  Accord, United States v. Liu, 267 F. Supp. 2d 371, 375 (E.D.N.Y. 2003)(granting a downward departure, "leading to imposition of the minimum sentence permitted," based on defendant's pathological gambling addiction, which "interfered with [his] ability to control behavior that he knew was wrongful"); United States v. Checoura, 176 F. Supp. 2d 310, 314 (D. N.J. 2001)(granting downward departure to compulsive gambler and noting that the defendant "did not choose to gamble compulsively, any more than other compulsives choose . . . to wash their hands after touching every doorknob").

In late 2003, without explanation, the Sentencing Commission issued a policy statement that "[a]ddiction to gambling is not a reason for a downward departure."  U.S.S.G. §5H1.4.  The policy statement was a response to the PROTECT Act, in which Congress directed the Commission "to ensure that the incidence of downward departures [was] substantially reduced."  Appendix C, amendment 651.  The Act was widely criticized for "shuck[ing] the wisdom . . . and breadth of experience accumulated by judges" in fashioning individualized sentences.  United States v. Mellert, 2003 WL 22025007, at *2 (N.D. Cal. July 30, 2003); see also J. Martin, Jr., Let Judges Do Their Jobs, N.Y. TIMES, June 24, 2003, (describing the Act as

BRACEWELL

October 20, 2016
Page 6

"completely at odds with the sentencing philosophy that has been a hallmark of the American system of justice").[4]

After Booker, §5H1.4's policy statement is not binding on a sentencing judge. See United States v. Jones, 460 F.3d 191, 194 (2d Cir. 2006)("the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves"); K. Stith, The Arc of the Pendulum:  Judges, Prosecutors and the Exercise of Discretion, 117 Yale L.J. 1420, 1482-83 (2008)(Booker "transmuted from 'law' to 'advice' all of the departure-reducing Guidelines amendments that the Sentencing Commission had promulgated pursuant to the [PROTECT Act]").  Section 5H1.4 is especially unworthy of deference because it was not the product of expert consideration.  See Kimbrough v. United States, 552 U.S. 85, 109 (2007)(where the Commission "did not take account of 'empirical data and national experience,'" the Guidelines should command little respect).

A leading post-Booker compulsive gambling case is United States v. Dikiara, 50 F. Supp. 3d 1029 (E.D. Wis. 2014).  There, the defendant embezzled more than $1 million from her employer and "gambled away virtually all of the proceeds of her crime at [a] casino." Id. at 1030; see also id. at 1031-32 ("[w]hat began as stress relief soon grew into an addiction"; the defendant "kept thinking she would eventually win enough to pay back the money she had taken").  Although the guideline range was 41 to 51 months, the court sentenced the defendant to

---

[4]    The Sentencing Commission may have been concerned that defendants were falsely claiming to be compulsive gamblers to gain leniency.  Courts, however, are capable of distinguishing those who are truly addicted from those who are not or whose gambling did not substantially contribute to their crime.  See United States v. Carucci, 33 F. Supp. 2d 302 (S.D.N.Y. 1999)(rejecting downward departure for compulsive gambling where defendant "yielded to temptation without anything like a Dostoevskian struggle").

BRACEWELL

October 20, 2016
Page 7

15 months' imprisonment, principally on the basis of her gambling addiction.  The defendant's compulsive gambling, the court observed, by "physically hijacking the brain, [had] diminishe[d] [her] capacity to evaluate and control . . . her behaviors."   Id., quoting United States v. Hendrickson, 25 F. Supp. 3d 1166, 1174 (N.D. Iowa 2014).  "Rather than rationally assessing the costs of [her] actions, [the defendant] . . . [had] act[ed] impulsively, without accurately weighing future consequences."  Id.

In sum, a variance for compulsive gambling is now not only permissible but "consonant with the compassion and humanitarianism which must always characterize the American system of justice."  L. Lustberg, Sentencing the Sick: Compulsive Gambling, 2 Seton Hall J. Sport L. 51, 76 (1992).

B.    Andrew Caspersen's Gambling History and Criminal Conduct

1.    1999 to 2003

Andrew Caspersen began gambling at Princeton University, where he frequently bet on sporting events, but he did not become a problem gambler until his first year at Harvard Law School in 1999.  That year, Andrew received a $2.7 million distribution from a family trust.[5]  Sitting alone in his room and drinking heavily, he began trading high-flier technology stocks.  He traded on margin and bet everything on one stock, always hoping to make a quick profit.  He was not interested in diversification or a buy-and-hold strategy.  By July 2000, Andrew had turned $2.7 million into $5 million, but his success was short lived.  When tech stocks plummeted the next fall, he lost all of his money.

---

[5]    Andrew's father earned vast wealth as the chief executive of the Beneficial Corporation, a consumer finance company.  See infra at 17-18.

**BRACEWELL**

October 20, 2016
Page 8

Having lost so much, Andrew fell into depression.  He could not focus on his classwork and took a leave of absence from school.  He moved in with his parents in New Jersey and saw a doctor, who prescribed anti-depressants.  Andrew did not disclose his trading losses, leaving the doctor to wonder "whether diagnostically there is anything that might provide additional information as to what triggered this illness."  Clinic Note 10/18/2000.[6]

The medication proved helpful, and Andrew returned to law school for the spring semester.  He soon received another large family distribution ($2 million) and resumed trading.  His strategy remained the same:  short/long tech stocks, trading on margin, and always a short time horizon.  With more trading came more drinking; consuming a six pack of beer in a few hours was common.

After a summer at the Dewey Ballantine law firm, Andrew returned to Harvard in the fall of 2001.  Then came September 11 and the terrorist attack on the World Trade Center.  Since his junior year at Princeton, Andrew had dated Catherine (Cat) MacRae, and they seemed destined for marriage.  After graduating Princeton, Cat took a job at Fred Alger, an investment advisory firm, on the 93rd floor of the World Trade Center, and she died in the attack.  Andrew left Harvard again, drank heavily and contemplated suicide for months.  Eventually, he returned to school, but was very much alone.

In all, Andrew lost more than $4 million trading stocks during law school.

---

[6]     Andrew's failure to disclose his gambling is not unusual.  Problem gamblers often seek treatment for depression or anxiety, rather than gambling, because of the stigma associated with a gambling disorder.  See Rash and Petry, Gambling Disorder, The Behavioral Addictions, 57-58 (2014)("it is only with repeated failures to stop or cut down their gambling that patients begin to perceive their behavior as problematic or uncontrollable and consider the possibility of seeking treatment").  Andrew's treatment records have been provided to the Probation Office.

BRACEWELL

October 20, 2016
Page 9

2.  <u>2004 to 2012</u>

After graduating law school, Andrew worked at Coller Capital, which bought portfolios of private equity assets in the secondary market.  Whenever Andrew came into money, he traded it.  His trading strategy evolved into "earnings plays" on companies like Amazon, Google and Apple.  He would buy (or short) shares on margin shortly before an earnings announcement, betting that the stock price would rise (or fall) with the announcement.  He soon began trading options to get more leverage and tried to have a trade on every day.  If a bet proved wrong, he could lose everything overnight.

In 2006, Andrew borrowed $1 million against his interest in a parcel of real estate and quickly lost the money trading.  The same year, he borrowed $250,000 from an IRA and lost it.  He sent his parents a letter, reporting his losses and expressing his shame.  His father admonished him and helped repay the borrowings, but there was no intervention.

In 2009, Andrew's father committed suicide.  After his death, family assets were distributed to Andrew and his brothers over the next six years.  As one might expect, what Andrew got in distributions he lost in trading.  In 2011, Andrew married Christina Frank, but marriage did not slow his trading.  He hid it from her, insisting on filing separate tax returns so that she would not see his mounting losses.  Between 2004 and the end of 2011, while at Coller, Andrew lost $8.1 million.

3.  <u>2012</u>

In January 2012, Andrew left Coller, supposedly to seek an opportunity that was more entrepreneurial.  Instead, for the next ten months, he traded options.  By then, his trading was pure gambling.  He did not analyze individual companies or study economic trends.  He

BRACEWELL

October 20, 2016
Page 10

bought S&P options at or near the money, mostly puts, betting that the S&P index would decline in value. Typically, he purchased options that expired in a week, the shortest duration available. He did not want to wait a month to learn whether a trade would succeed.[7] And he was always "all in"; whatever money he had, he traded. When he cashed out a position, he bought back in the next day.

   If anyone had observed Andrew's behavior in 2012, the observer would have been astonished. Each day, Andrew made only one decision -- to hold or sell a position -- but it preoccupied him. He rented a small office with a desk and telephone and sat there staring at the S&P index on his computer screen. Some days, he recorded every tick of the S&P index from opening to close on a legal pad. When he left for lunch or a walk, he took an iPad with him so he could track the market's movements. (People gawked at him as he walked around the Central Park reservoir with his iPad open.) He used an iPad because it refreshed more quickly than his cellphone and kept him from missing a tick. If he held a position overnight, he hid his cellphone under his pillow to sneak looks at the futures market. He awoke at 3:00 a.m. to check the European stock market at its opening. Winning brought relief and losing distress; but far worse were the days when the market was closed, and he could not trade.[8] His trading records for the year span 440 pages.

---

[7] Problem gamblers often want quick results. In a recent civil filing, New York State Attorney General Eric Schneiderman identified "the high speed of play (or, put another way, the relatively short interval between the placing of a bet and the determination of the outcome of the bet) [as] a structural characteristic" that is especially attractive to problem gamblers. See Complaint at 22-23, People v. DraftKings, Inc., No. 453054/2015 (N.Y. Sup. Ct. Dec. 31, 2015).

[8] A former lawyer convicted of embezzling from his clients observes this about his compulsive gambling: "[w]inning and losing no longer had anything to do with my trips to the

BRACEWELL

October 20, 2016
Page 11

In the summer of 2012, needing money to trade, Andrew persuaded his brother and mother to lend him more than $2 million so that he could invest in a favorable private equity opportunity.  The opportunity was genuine, but Andrew used the money for trading.  Andrew doubled the $2 million, but then lost it all.  When he admitted his trading losses to his family, they persuaded him to seek counseling.  That November, he saw a psychiatrist, who prescribed an anti-depressant, but Andrew was reluctant to pursue therapy.  In March 2013, on Andrew's last visit, the psychiatrist observed that Andrew's "pathological gambling [was] currently in remission."

In ten months in 2012, Andrew lost $6.7 million trading.

4.   <u>2014 to March 2016</u>

In January 2013, Andrew began working at Park Hill, which provides advisory services for private equity firms.   (He did not manage money or make investment recommendations in his job.)  For most of the year, he abstained from trading, but in late December 2013, he received a $490,000 bonus and immediately transferred it to a trading account.  For the next 11 months, he traded his bonus money and family distributions with

---

casino; everything now revolved around being in action."  M. Burke, Never Enough:  One Lawyer's True Story Of How He Gambled His Career Away 26 (2008).  Another pathological gambler has written this:

> In the beginning I gambled because it was fun . . . .  When I was tense, gambling relaxed me . . . .  I celebrated feeling good by gambling.  Slowly, over time, gambling became the only coping mechanism I knew . . . .  I continued to gamble to ease my pain - the pain of lost money, lost time, lost self-respect, and the pain of losing control.  With every futile attempt to stop came more pain, anger, frustration and depression.

A. Guenaga, <u>Improving the Odds</u>, 2 UNLV Gaming L.J. 133 (2011).

BRACEWELL

October 20, 2016
Page 12

varying success.  By late November 2014, he had lost everything once again.  A $4.25 million bonus was due in a month, but he could not wait for it to come.  Desperate to keep going, he conceived of a scheme to obtain money from friends under false pretenses.

Andrew emailed two long-time friends -- friends A and B -- and told them that a private client had given him an allocation in a practically riskless debt instrument, and he offered them the opportunity to invest with him.  The debt instrument supposedly carried a 15 percent interest rate when the one-year LIBOR rate was less than one percent.  The note had a two-year maturity, but accelerated repayment was possible with full interest.  It was too good to be true, and it wasn't.  Friend A declined, but friend B "invested" $2 million, wiring the money to a bank account that Andrew controlled.  Andrew sent friend B a sham note purportedly evidencing the investment and promptly transferred the $2 million to his trading account.[9]  When he took friend B's money, Andrew was confident that he could double it quickly and repay it.  He soon doubled it but kept trading, and by the end of January 2015, most of it was gone.[10]

---

[9]    To create the sham note, Andrew took a promissory note from his father's estate and modified it slightly to allow for early repayment.

[10]    Andrew's belief that he would win despite having consistently lost is common to compulsive gamblers.  See J. Mazur, What's Luck Got To Do With It? 184 (2010)("[t]he pathological gambler consistently loses more than she wins; yet often those losses do not diminish her belief in control").  Alexis, in Dostoyevsky's The Gambler, is typical:

> "I always felt certain," he tells Polina in a gloomy tone, "that I should win. Indeed, . . . [I] ask myself -- Why have my absurd, senseless losses of today raised a doubt in my mind?  Yet I am still positive that, as soon as ever I begin to play for myself, I shall infallibly win."

F. Dostoyevsky, The Gambler, 81 (1866).

BRACEWELL

October 20, 2016
Page 13

When his account was depleted, Andrew offered the same sham investment opportunity to others.  In February 2015, four friends (C, D, E and B again) invested a total of $5 million.  By mid-March, he had lost it all and needed more to keep trading.  He offered the investment opportunity to his mother and brother, and they invested $1.5 million together.  In April, friend F invested $950,000.  In June, Andrew received a $900,000 family distribution, and in July, friend G invested $500,000.  All of the money went to trading and was lost.

In September 2015, Andrew found a new way to obtain money for his gambling. He diverted funds that two clients owed Park Hill by sending them fake invoices, which directed payment to an account he controlled.  He took $8.3 million from one client and $770,000 from another.  As soon as the money arrived, Andrew transferred it to his trading account.  Taking money owed to his employer was riskier than taking it from friends.  The Park Hill CFO kept asking about the money, and Andrew kept inventing stories to appease him.  By the end of October, his trading account had plummeted again, and Andrew sought out another "investor" to allow him to repay Park Hill and trade more.

In November 2015, Andrew spoke to friend H, who advised the founder of Moore Capital, a prominent hedge fund.  Andrew explained the investment opportunity; friend H was intrigued; and the Moore foundation invested $24.6 million and friend H $400,000.  Andrew repaid Park Hill and traded the rest.  During the next two months, he received a $1.4 million family distribution and induced friend B to invest another $750,000.  All of it went for trading. When the year ended, Andrew had $8.7 million in his trading account and was confident that the market would move in his direction in 2016.

BRACEWELL

October 20, 2016
Page 14

Life is often a roller coaster for a compulsive gambler, but 2016 was extreme for Andrew.  The first two weeks of January, the market fell on news of the Chinese devaluation.  See P. Vigna, Stock Market Puts In Worst Opening Week Ever, The Wall Street Journal Jan. 8, 2016.  Andrew owned puts, and the market's fall was his gain.  On January 15, his trading account was worth $71.6 million.  Andrew told himself that it was time to cash out.  He could repay his family and friends and recoup the more than $20 million of his own money he had lost since entering law school.  But thoughts of exiting were fleeting.  He was soon all in again, this time uncharacteristically purchasing calls.  On January 20, he almost lost everything when the market continued to decline.  It rebounded, however, and on January 22, he had $74 million in cash.  He purchased puts, and this time bet right.  See P. Vigna, U.S. Stocks Drop Again, and S&P 500 Falls Below August Lows, The Wall Street Journal, Feb. 8, 2016.  On February 11, his trading account peaked intra-day at $126 million, and he had $112.8 million in cash at the close.

Over President's Day weekend, Andrew debated with himself once more.  He could now repay his friends and walk away with $60 million.  He would be rich for life.  But the voice telling him to stop lost out to the compulsion to continue.  The next morning, he bought $100 million of puts at the open.  See letter of Dr. Neil Goldman ("[h]is inability to stop demonstrates how progressive his addiction had become").[11]  Then the roller coaster headed downward.  The market rebounded, and Andrew's trading account declined precipitously.  See P. Vigna, U.S. Stocks 'March' Higher, The Wall Street Journal, March 1, 2016.  On March 1, he

---

[11]    Dr. Goldman has treated Andrew since his arrest.   See Appendix B (letter of Dr. Goldman).

BRACEWELL

October 20, 2016
Page 15

sat alone and watched in disbelief as the S&P index moved higher throughout the day.  At day's

end, the value of his trading account was $16.4 million.  Three days later, it was $1.2 million.[12]

In the early weeks of March, Andrew sought feverishly to obtain additional

money to continue gambling.  He called friend H at Moore, and, remarkably, Moore agreed to

invest another $20 million.  The funds were set to arrive on Tuesday, March 8.  Alarmed at the

prospect of not having money to trade on Monday, Andrew asked if the payment could be

advanced one day.   Moore grew wary and walked away; it wanted its initial $25 million

investment back.  Another company discussed investing $50 million (Andrew hoped to repay

Moore and have $25 million to trade), but it insisted on extensive diligence and soon broke off

communication.  On March 19, Andrew took his family to Florida to visit his mother, knowing

that there was no more money.

On the plane ride home from Florida, Andrew composed a suicide note to his wife

and a letter to his "creditors."  He explained to his creditors that he had engaged in "outright

fraud" and was "deeply ashamed of [his] scheme for many reasons, not the least of which is

. . . that my victims included family and friends."  He wrote:

> It may be hard for you to believe but I actually thought this would work.  It is
> only now that I realize how destined it was for failure.  I'm not sure if my
> misguided thinking was a result of cognitive dissonance, stupidity, insanity or a
> combination thereof.  In my mind, I thought the notes would be outstanding for a
> short period of time and I would repay with prepayment penalties.  Perhaps that is
> how I justified it.  One can debate how stupid the justification is; it is beyond
> debate how immoral it was.  I often wonder how different things might be for

---

[12]     Andrew was so heavily leveraged that between February 16 and March 4, the S&P index
rose  5.3 percent (from  189.78  to  200.43)  and  his  account  declined 98.7 percent (from
$94.8 million to $1.2 million).

BRACEWELL

October 20, 2016
Page 16

everyone, including my family, if I had just repaid the notes this winter.  But I did
not and the consequences are severe for all of us.

He had transferred the $1.25 million left in his account to Christina without her knowledge, and

begged his creditors to leave her alone.  (While in Florida, he had written a will leaving what was

left to her.)  When the plane landed in New York, investigators were there to arrest him.  He was

surprised and relieved.

Notably, Andrew's trading from December 2013 to March 2016 followed the

same course as in 2012, only the amounts involved were larger.[13]  Trading obsessed him.  He

looked at a CNBC app on his cellphone during the work day.  He tried not to schedule meetings

the first and last hour of the trading day, so he could focus on the market.  He cleared his

calendar on Fridays when his options were expiring.  He avoided airplane travel during trading

hours and, when that was not possible, ensured that Wi-Fi was available so that he could trade on

the plane.  A number would sometimes pop into his head, and he would write it on a piece of

paper or in the steam on the shower door, hoping to discover its significance later.  And as the

dollars at risk increased so did his drinking.  He often stopped for a drink on the way to work in

the morning and left work in the afternoon to drink and watch the market, frequenting bars where

his colleagues would not see him.  He drank to relieve his anxiety and drown his losses and guilt.

The joy that once came from winning was gone and replaced with the need to be in the action

always.

---

[13]     See Gambling Addiction and the Brain ("[p]eople will get inured to the high of gambling
. . . and need to gamble with bigger bets and riskier betting options").

BRACEWELL

October 20, 2016
Page 17

That Andrew continuously lost money is not surprising.   An options trading

expert who has reviewed Andrew's trades describes them as "basically coin flips."  He writes:

> I am familiar with rogue traders who attempt to offset their losses with
> progressively larger trades, but their intent is to stop when they make back what
> they lost.  For Mr. Caspersen, it was never about getting back to even or taking a
> profit.  No matter how well or how poorly he was doing, it was always all in, all
> the time, with no stopping point.  When you continually purchase at-the-money
> put options with all of your capital in a gyrating market, there is only one possible
> outcome:  the complete loss of your capital.  Only a person in an irrational state
> would embark on (and remain on) the path Mr. Caspersen pursued.

Buying options, the expert concludes, "may have satisfied some psychological need," but "no

rational trader would trade in the way Mr. Caspersen did."[14]

C.      Accomplishments

Andrew Caspersen was a high functioning pathological gambler, who hid his

sickness from his family, friends and business associates.  As their letters to the Court attest, they

saw a different person from the one who lost $60 million trading ($23 million of his own money

and more than $36 million of others).[15]  Andrew's accomplishments are described below.

Andrew Caspersen was born on October 6, 1976, the youngest of four sons of

Finn and Barbara Caspersen.   As the Presentence Report notes, Finn was a "well-known

---

[14]      The trading expert also writes this:

> During the month of January 2016, Mr. Caspersen paid commissions of $444,579
> and had other execution costs of as much as $900,000, well in excess of
> 10 percent of the capital with which he began the month.  In short, the casino at
> which he was gambling -- the options market -- had a high cost of admission.

The expert's letter to the Court is attached as Appendix D.

[15]      Letters from Andrew's family and supporters are attached to this submission as
Appendix A.

BRACEWELL

October 20, 2016
Page 18

financier and philanthropist," who made his fortune as CEO of the Beneficial Corporation and donated millions of dollars to Brown, Harvard and Drew universities.  Presentence Report ¶ 76. At age 14, Andrew left home to attend the Groton School in Massachusetts, where he excelled in academics and sports.  See letter of Christopher Watts (Andrew "was voted by the coaches as the most valuable player in our [football] league, an accolade that didn't change his [modest] demeanor . . . one bit").

Andrew went on to Princeton University, where he earned a reputation for having a "firm grasp of the 'right' thing to do."  Letter of John Burnham.  Andrew was the "adult in the room" to whom others turned "[i]f there was a question of how [to] handle a certain situation." Id.; see also letter of Peter Hallock ("[h]e was our moral compass -- and made sure we acted with integrity"); letter of C. Anderson Parker ("I aspired to be like Andrew, to make mature decisions like Andrew, and to think of others before myself like Andrew").

In his junior year at Princeton, Andrew fell in love with Cat MacRae, who was a year behind him.  See letter of Meghan Magyar (they "were young and in love and lovely to be around").  As noted above, Cat was killed in the World Trade Center attack, and Andrew was devastated.  Ann MacRae, Cat's mother, describes his reaction:

> On the morning of September 11th, Andrew called me from Cambridge, Massachusetts, breathlessly asking if I had any news . . . .  He arrived at our apartment early the morning of September 12th and he stayed with us, sleeping in Cat's bed for two weeks.  As friends came in and out of our apartment, Andrew could barely speak.  He sat, stone-faced, as tears streamed down his face.  He told me he didn't know if he could go on.  While he was staying at our apartment, I would check on him each morning as he slept in Cat's bed, to make sure he was still alive.

BRACEWELL

October 20, 2016
Page 19

Letter of Ann MacRae.[16]   In Cat's memory, Andrew helped establish the Cat MacRae Fund to support educational programs for low income children in New York City.   See letter of Ann MacRae ("Andrew and I worked very hard [to] find[] the programs which we thought were the right fit for our goals").

As his friends write, it took years for Andrew to recover from Cat's death.   See letter of Christina Bryan ("[h]e became distant, lost and deeply depressed . . . and [we] wondered whether he would ever recover").   In 2007, Andrew began dating Christina Frank, and three years later, they were engaged.   For Andrew, it was a rebirth.   Christina was a devout Catholic, and Andrew chose to convert to Catholicism to express his commitment to her.   See letter of Mary Schwartz ("Andrew went out and bought all the books and read every one of them; his conversion is genuine and deep"); letter of Jane Frank, Andrew's mother-in-law ("[m]y joy at his sharing our family's faith is everlasting").   On their Pre-Cana weekend, Andrew and Christina "pledged that [they] would not let . . . the relentless pursuit of money drive decisions in [their] lives."   Letter of Christina Caspersen.

---

[16]   In her letter to the Court, Barbara Caspersen writes this about the effect of Cat's death on Andrew:

> Andrew was devastated by Cat's death and dropped out of law school for a term. I remember him saying to my husband and me:   "Mom and Dad, when someone your age loses a spouse or someone close, that is sad, but at least the survivor has had a long and fruitful life of shared experiences with the person who died.   In contrast, I have lost my future."   Looking back, I think that his years of despair following 9/11 fueled addictions that might have been tamed and overcome had he been able to face them clearly.

Letter of Barbara Caspersen.

BRACEWELL

In 2009, while Andrew and Christina were still dating, tragedy struck again when Finn Caspersen committed suicide. Finn was Andrew's role model, and his suicide sent Andrew into a tailspin. His wife writes:

> While I had only observed Andrew and his father together for a few short years, it was very clear to me that they were closer than any father-son pair I had encountered. Andrew absolutely revered his dad. Finn's suicide profoundly affected Andrew. Over the next few months of 2009, I experienced Andrew's anguish on a daily basis.

Letter of Christina Caspersen. Depressed, Andrew gambled and drank more. See letter of Dr. Goldman ("[w]hile Andrew sought relief in gambling and drinking at the time, he has now embraced therapy to understand and process his father's downfall").[17]

Despite the tragedies of Cat's and Finn's deaths, Andrew built a solid career in business, where he focused on the "secondary's industry" in private equities. He was fortunate to have a mentor, Frank Morgan, whom he met at Dewey Ballantine when he was a summer associate. When Mr. Morgan left Dewey to join Coller Capital, Andrew followed him and worked there for eight years. Even though Andrew used Coller's name to perpetrate his fraud, Mr. Morgan and Jeremy Coller have written letters on his behalf. Jeremy Coller writes this:

> From my observations and personal contact over the eight year period, I saw a young man who performed his job well and was respectful of his colleagues. He was continually promoted through the ranks to become a Principal in our firm. As such he had responsibility for originating transactions and executing them. In all of the transactions on which he worked, I only saw dedication, hard work and

---

[17] It is common for a stressful life event to trigger or accelerate problem gambling. See N. Turner et al., The Experience of Gambling and its Role in Problem Gambling, 6 Int'l Gambling Stud. 259 (2007)("[s]tressful life events . . . [are] emotional pathway[s]" to pathological gambling). Indeed, among the DSM-5 diagnostic criteria is that an individual "[o]ften gambles when feeling distressed (e.g., helpless, guilty, anxious, depressed)."

BRACEWELL

October 20, 2016
Page 21

integrity such that I was literally shocked to learn of the machinations which led
to the charges to which he pled guilty.

Letter of Jeremy Coller; see also letter of Terence Flynn ("Andrew was truly viewed as the

leader in this practice with all of the high profile successful transactions"; he "led by example

. . . always respecting all of the various parties and constituents in a transaction").

Jonathan Gutstein, who worked with Andrew at Coller, writes about Andrew's

reputation as a "consistently considerate, caring [and] thoughtful" colleague:

> [Andrew] made no distinction among Partners, junior professionals, and support
> staff in handling himself this way.  As Andrew rose in the company, he took a
> personal interest in and committed substantial time to mentoring junior
> professionals.  Not surprisingly, junior staff clamored to work on Andrew's
> projects.  They knew what all of us knew:  they could trust him, and he'd see the
> best in them and treat them with patience, respect, and warmth.

Letter of Jonathan Gutstein.[18]

Andrew's concern for others is a theme that runs throughout the letters to the

Court.  See, e.g., letter of Anne Ameno ("no one ever responded to my loss[es] with quite the

same kindness that Andrew had"); letter of Blackford Brauer ("Andrew has been asked to be a

---

[18]     Among the letters to the Court is one from Ari Benacerraf, a co-founder of Diamond
Castle, a private equity firm that Andrew led through a successful recapitalization transaction in
2014.  Andrew used Diamond Castle in his fraud scheme, risking its reputation.  See letter of Ari
Benacerraf ("Andrew put [our firm] and our investors at risk").  Nonetheless, Mr. Benacerraf has
written in support of leniency and says this about Andrew's work for Diamond Castle:

> In 2014, Andrew led us through a successful transaction.  In the process, he
> earned the respect from the partners at DC, the existing investors and the new
> investors.  He also worked closely with our counsel at Debevoise & Plimpton to
> ensure we complied with all our contractual obligations.  Throughout, Andrew
> acted with the utmost integrity.  Upon consummation of the transaction, we called
> Blackstone leadership to express our gratitude to Park Hill and, in particular,
> Andrew for excellent work.

Id.

BRACEWELL

October 20, 2016
Page 22

godfather to seven children -- surely a record for such a young man"); letter of Hunter Horgan

("[w]hen we set up saving structures for our children . . . , Brooke and I did not hesitate to

designate Andrew as Trustee [for] there was no one we trusted more"); letter of Edward Wartels

("[h]e had the gift of putting things in perspective . . . and was particularly supportive when I

lost my mother"); letter of Margaret Brotherton (Andrew "help[ed] me navigate my career over a

long period of time; the world needs more mentors and Andrew was a great one"); letter of

Christopher Watts ("in 2011, when a teacher, coach, and friend from Groton committed suicide,

Andrew quickly made arrangements for a few classmates to travel to Indiana . . . for the

memorial service"); letter of Mary Schwartz ("when he discovered [the parish] was trying to

fundraise . . . to help pay for my salary . . . he immediately offered to pay the entire amount of

$20,000 and sent a check to the church"); letter of Father Walter Wagner ("[t]he Caspersens

were at the heart of [our families with young children] initiative . . . and regularly took turns

hosting [the gatherings]"); letter of Blackford Brauer ("[i]n 2010 and 2011, when Andrew and

Christina were volunteering together at a soup kitchen and one of the nuns . . . mentioned their

need for a new boiler . . . Andrew quickly met the need"); letter of Brooke Horgan (Andrew

helped obtain a "9-month extension of a visa" for a junior colleague whose "mother was sick

with cancer . . . and receiving treatment at Sloan Kettering"); letter of Hunter Horgan ("Andrew

has always been incredibly kind and generous, with friends, family and charities that he cared

about").

BRACEWELL

October 20, 2016
Page 23

Making a difference in so many lives is no small achievement.  See United States

v. Cooper, 394 F.3d 172, 177 (3d Cir. 2005)(noting that defendant's actions were not "detached

acts of charity . . . . [but were] in a very real way, hands-on personal sacrifices, which have had a

. . . positive impact on the lives of others").[19]

No discussion of Andrew's concern for others would be complete without

mention of his two children, Jack, age three, and Grace, age one.  During the years that Andrew

struggled with gambling and alcohol, he could be a distracted parent.  Now his children are his

focus.  Jane Frank, Andrew's mother-in-law who has resided with the family since Andrew's

arrest, describes it best:

> To see Andrew today with Jack and Grace is to see a father completely in love
> with his 3 and 1 year old . . . .  It has been wonderful for all 3 of them.  As we
> prepared to leave Florida on March 26th for New York, just hours before
> Andrew's eventual arrest, I watched as Andrew packed up the stroller and tried to
> tape the cover on.  Grace was 11 months old and so anxious to help by playing
> with the tape.  Andrew barely noticed her.  It broke my heart.  Little did I know
> what was going through his mind at the time.  Despite the incredibly shocking and
> difficult circumstances that have characterized the past 5 months, three people
> have blossomed and their love and laughter is such a joy to behold.

---

[19]     The respect in which Andrew was held is evident by the shock that his friends
experienced on learning of his arrest.  See also letter of John Burnham  ("we [were] all in shock;
Andrew is literally the last person we would have expected to be in this situation"); letter of Suzy
Brauer ("[o]f the hundreds of people we know, Andrew [was] the absolute least likely person to
commit a crime"); letter of Hunter Horgan ("when I first heard of Andrew's arrest I thought that
there had been a case of mistaken identity"); letter of Campbell Walmsley ("[m]y first thought
was that it was a different Andrew"); letter of Robin Thebault ("[n]ot a single friend I spoke to
could believe what they heard to the point where people thought it was just outright wrong").
See Zecevic v. United States Parole Com'n, 163 F.3d 731, 735 (2d Cir. 1998)(noting that "letters
from [supporters] expressing shock at the defendant's behavior" are a relevant datum for a
sentencing judge).

BRACEWELL

October 20, 2016
Page 24

Letter of Jane Frank; <u>see</u> <u>also</u> letter of Celia Santos, nanny ("[w]hen Andrew walks into a room, Grace's willfulness disappears and she lights up").

D.      <u>Post-Arrest Conduct</u>

        After being released on bail, Andrew voluntarily admitted himself to the psychiatric ward at New York Presbyterian Hospital.   (His family wisely encouraged the hospitalization.)   He was deeply depressed and non-functioning.   He stayed there for 16 days with his wife as his principal visitor.   When he was discharged, Christina was not ready to take him home.   She was supportive but angry at him for hiding his gambling from her for so many years.   He moved into a room at the Holy Name Society Building at 65th and Lexington Avenue, a rooming house run by the Dominican Order, and stayed there for two months before moving back home.   At the Holy Name Society Building, Andrew received spiritual counseling, attended daily mass, read and reflected.   He also began working at a soup kitchen run by the Missionaries of Charity in northern Manhattan.   He continues to work there two mornings a week, preparing food and cleaning up.   <u>See</u> letter of Marie Joel, Mother Superior ("[h]e helps prepare and serve food, clean, tend to the garden . . . and any other job that we ask of him [and] has helped us immeasurably in [our] mission").

        Andrew has also met twice a week with Dr. Neil Goldman, an addiction specialist, and once a week with Dr. Jennifer Graybill at the St. Mark's Place Institute.   (Dr. Graybill was recommended by Pretrial Services, and Andrew has found their sessions a useful complement to Dr. Goldman's.)   Dr. Goldman's letter to the Court recounts the course of treatment and includes this:

**BRACEWELL**

October 20, 2016
Page 25

> Mr. Caspersen has been actively engaged in our therapy with the focus on understanding and eventually resolving and correcting the severe impact that his gambling and alcohol problems have had on his life. During the time I have seen him, now over six months, I have been deeply impressed with his commitment to treatment. He has pursued it honestly and seriously. He has immersed himself fully in treatment and clearly has benefitted substantially from it. In my many years working with persons with addictive disorders, I have had few patients who have taken their recovery so seriously. It is particularly impressive given how exceedingly severe his gambling addiction has been.

Letter of Dr. Goldman.[20]

Just as importantly, Andrew has attended Gamblers Anonymous three times a week and Alcoholics Anonymous at least twice a week, chairing one of the meetings. He has not bet or had a drink since his arrest. Several of his GA and AA brothers, including his sponsors, have written to the Court. Bruce Rosenblum's letter bears quoting:

> When he entered the GA room he hit the ground running . . . . Talking about the never ending merry go round he could not get off. Control was lost and help was needed. These rooms will give him the help he needs... He has been fighting for a better life and achieving recovery. With a new and clear mind he wants to be a better father, husband and person and has been achieving this . . . . [H]e seems fully committed.

Letter of Bruce Rosenblum.[21]   See also letter of Sam Paolini (Andrew's "commitment to 'arresting' his compulsive gambling addiction is one of the strongest in our regular Wednesday

---

[20]   One measure of the severity of Andrew's gambling addiction is his score on the South Oaks Gambling Screen:  Andrew scored a 19 out of 20 with a score of 5 indicating probable pathological gambling. See letter of Dr. Mark Potenza.

[21]   Bruce Rosenblum was convicted in this District for selling ecstasy and ketamine. See United States v. Rosenblum, No. 11-cr-674 (NRB)(SDNY). He was sentenced to probation at a proceeding at which 70 GA members appeared to support him. Sentencing Tr. 3/21/13 at 32 (the court "find[s] sufficient arguments have been presented that cause me some concern that incarcerating the defendant will interfere with the positive path he is on").

BRACEWELL

October 20, 2016
Page 26

night room"); letter of Edward Heppt ("as his [AA] sponsor, I can declare with certainty that

Andrew has been painstaking about his process of recovery").

     As part of his 12-step program, Andrew has sought to make amends with his

victims.  He has written all of them and met with six of them.  He has also met with three of the

five firms whose names he sullied by involving them in his fraud and spoken with a fourth.

Andrew did not need GA or AA to get started on the right path.  Early in his recovery, he wrote

this to his close friend Blackford ("Beau") Brauer:

> I'm trying not to bite off more than I chew but I'd also like to take advantage of
> this opportunity.  I like to think of myself as undergoing an operation to remove
> the cancerous tumors of alcoholism (Stage II) and compulsive gambling (Stage
> IV).  While I'm under the knife, I might as well tackle some of the other ailments.
> And once I'm in recovery, I will need to practice good habits to ensure there is no
> relapse.  If I can improve other parts of my life, all the better.

Letter of Blackford Brauer.[22]

     Numerous friends write of Andrew's shame.  See, e.g., id., ("[w]hile some

criminals might not comprehend the full effects of their crimes, Andrew is completely overcome

and ashamed"); letter of Hunter Horgan ("I know Andrew will devote the rest of his life to doing

whatever it takes to earn back the trust and love of his family and friends"); letter of Ozzie

Abaye ("Andrew today is completely stripped of pride, visibly relieved from the burden of

addiction . . . and living a life of honestly [sic] and transparency and focused on making

---

[22]    Andrew attempted to obtain money from Beau Brauer (friend A above) as part of his
fraud.  Nonetheless, Mr. Brauer and his wife have helped Andrew post bail, paid his legal fees
and provided for Jack and Grace in the months since Andrew's arrest.  See letter of Blackford
Brauer ("Suzy and I could choose to feel betrayed by Andrew's true intent, but we don't; we
only feel the strongest sympathy for him and his innocent family").

BRACEWELL

October 20, 2016
Page 27

amends"); letter of Darren Boswell ("[h]e has been . . . emptied by his own actions . . . humbled [and] has what we call in recovery the 'gift of desperation'").

Andrew Caspersen is not "cured" -- addicts never are -- but he has taken giant steps to regain control of his life.  See Dikiara, supra, at 1033 (emphasizing the importance of treatment to prevent recidivism).[23]

E.      Conclusion

As this Court has observed, "sentencing is the most sensitive, and difficult, task that any judge is called upon to undertake."  United States v. Adelson, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006).  Andrew Caspersen's case proves the point.  This is not a case in which a sentence should be based principally on the amount of money that Andrew's victims lost, as the Sentencing Guidelines would have it.  Id. at 509 ("the Sentencing Guidelines . . . in an effort to appear 'objective' tend to place great weight on putatively measurable quantities . . . without, however, explaining why it is appropriate to accord such huge weight to such factors").[24]  The

---

[23]      Rehabilitative efforts matter.  Notably, in 2002, after a casino opened across the border from Amherst, New York, the municipality established a gambling court to provide a "therapeutic, intervention and rehabilitative approach -- within the criminal justice system and under judicial supervision -- for defendants who commit non-violent crimes because of gambling addiction."  Gambling Court http://www.gamblingcourt.org.  More than 100 defendants have been diverted to treatment, and only three have been rearrested.  See K. Belson, New York Gambling Treatment Court Stresses Help, N.Y. Times, May 1, 2007.

[24]      The Guidelines range is 151 to 188 months' imprisonment.  In addition to the loss amount, what drives up the range is the four points that are added under §2B1.1(b)(19)(A) because Mr. Caspersen was a registered broker dealer.  That enhancement applies, but fits this case poorly.  Mr. Caspersen was a registered broker dealer, but he performed none of the functions typically associated with that position.  He did not trade or hold client funds.  Indeed, as we understand it, under current SEC Guidelines, he would not be required to register as a broker dealer.  See SEC No-Action Letter Re:  M&A Brokers (Jan. 31, 2014).  Notably, the guidelines proposed by the ABA Task Force on the Reform of Sentencing of Economic Crimes

BRACEWELL

October 20, 2016
Page 28

amount lost was large because Andrew's gambling addiction drove him to seek more money and

because he had friends and family who trusted him and were wealthy.  He never intended for

them to lose, yet he could not stop and repay them, no matter how much he had won.  Unlike

most fraud cases, greed played <u>no</u> role here.  There was no high living or lavish purchases.

Andrew and Christina lived on their combined salaries, and he bet everything else.[25]

The words of Frank Morgan, President of Coller Capital and Andrew's mentor,

provide an insightful summary of this case.  Mr. Morgan writes:

> What do I make of all this?  First, this all came as a complete shock.  There is
> absolutely nothing in my long experience of Andrew that would cause me to
> believe he would be capable of what he has done.  Although I have no medical
> background and am not privy to any information, I can only believe that this was
> caused by a deep sickness that took over the guy I knew who had values and
> principles totally inconsistent with this behavior.  Second, the crimes committed
> were clearly not motivated by greed or an extravagant lifestyle which one often
> reads about in white collar crimes.  He did not personally benefit financially from
> this activity and at least in my mind that seems less blameworthy than some of the
> avaricious characters one reads about.  Third, I have tremendous compassion for
> Christina and the two small children who are blameless in this but are and will
> suffer by having an absent and disgraced father.  And finally, I firmly believe that
> now that Andrew has sought and received the treatment he desperately needed
> that he will pull through and do everything he can possibly do to make amends to

---

yield a range far lower than the plea agreement range.  The guidelines focus on true culpability
factors other than just loss.  <u>See</u> <u>United States v. Litvak</u>, 3:13 Cr. 19 (D. Conn. July 23,
2014)(court relies on ABA guidelines, noting it was "in complete agreement with the drafters of
this proposal, some of whom are highly regarded judges in this circuit, in which the drafters urge
[sentencing judges] not to focus on things that are easily quantified").

[25]     Only luck prevented Andrew's criminal conduct from being discovered before the losses
grew so large.  For example, on September 9, 2015, before Andrew took $25 million from
Moore, he was present at a closing dinner for the client whose $8.3 million fee he had diverted
from his employer.  <u>See</u>, <u>supra</u>, at 13.  Andrew spent the evening in fear that someone would
mention the fee ("did you guys receive it?"), and his diversion would be exposed.  <u>See</u> <u>United
States v. Emmenegger</u>, 329 F. Supp. 416, 427 (S.D.N.Y. 2004)("[t]o a considerable extent, the
amount of loss caused by [a] crime is a kind of accident").

BRACEWELL

October 20, 2016
Page 29

> his victims both financially and emotionally as he contemplates incarceration and
> the life that may follow.

Letter of Frank Morgan.

As noted above, virtually all of those who have written letters report that they

were shocked when they learned that Andrew had been arrested.  That is not simply because

Andrew hid his gambling from others but because others knew him as a person of integrity and

deep humanity.  In the words of his friend John Burnham, "in our eyes Andrew [was] one of the

most honorable people we [had] ever met."  Letter of John Burnham.  Those words, and others

like them, are powerful indicators of the good that Andrew has done, and will do in the future.

See United States v. Gupta, 904 F. Supp. 2d 349, 354 (2012)("a court [must] take account of a

defendant's character in imposing sentence, . . . for on this day of judgment, must not one judge

the man as a whole?").

We recognize that Andrew Caspersen's crimes are too serious for him to go

unpunished.  There has already been meaningful punishment.  He has suffered the stigma of a

felony conviction and the loss of the ability to work in the financial service industry, where he

was a rising star.  See United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009)("the need for

further deterrence and protection of the public is lessened because the conviction itself already

visits substantial punishment of the defendant").[26]  Whatever property he has will be forfeited.

Perhaps most importantly, Andrew has taken giant strides to conquer his demons.  He is

committed to treatment and sobriety and to rebuilding his relationship with Christina and their

---

[26]     In September, the Securities and Exchange Commission entered an order barring Andrew
from association with any broker, dealer, and investment adviser.  See In the Matter of Andrew
W.W. Caspersen, Exchange Act Release No. 78842 Administrative Proceeding (Sept. 14, 2016).

BRACEWELL

October 20, 2016
Page 30

children.   A lengthy prison sentence could derail him.   See United States v. Hawkins, 380 F.

Supp. 2d 143, 165 (E.D.N.Y. 2005)("[r]ehabilitation should not now be destroyed by

. . . unthinking application of mechanical rules for imprisonment").   If ever compassion and

mercy were called for in sentencing a defendant, this is such a case.[27]

<div style="margin-left: 40%;">

Respectfully submitted,

Bracewell LLP

s/ Paul Shechtman

Paul Shechtman
Margaret Lynaugh

</div>

PS/ML:wr

cc:      AUSA Christine Magdo

---

[27]      In his letter to the Court, Dr. Potenza writes this:

> I believe that Mr. Caspersen's mental health conditions should be given serious
> consideration in fashioning his sentencing.  Mr. Caspersen suffered from a severe
> gambling disorder, a mental illness, and there is little doubt that it contributed
> substantially to him losing his own money and seeking money by fraud from
> others to continue on the same destructive path.  As an increasingly growing
> literature emerges on the neurobiological underpinnings of gambling disorder,
> there exists a firm foundation on which to base such consideration.

etter of Dr. Marc Potenza.

#5289196.1