UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

            -v.-                  :    16 Cr. 414 (JSR)

ANDREW CASPERSEN,                 :

            Defendant.            :
- - - - - - - - - - - - - - - x


**GOVERNMENT'S SENTENCING MEMORANDUM**


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                              of America


Christine I. Magdo
Assistant United States Attorney
- Of Counsel -

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in connection with the sentencing of defendant Andrew Caspersen ("Caspersen" or the "defendant"), which is scheduled for November 4, 2016 at 2:00 p.m., and in response to the defendant's sentencing letter dated October 20, 2016 ("Def. Ltr."). The parties and the United States Probation Office agree that the Guidelines range applicable to the defendant's conduct is 151 to 188 months' imprisonment. (Presentence Report dated October 21, 2016 ("PSR") ¶ 154). The defendant does not request a specific sentence but asks the Court for a downward variance based largely on the defendant's "gambling disorder." For the reasons set forth below, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 151 to 188 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

**BACKGROUND**

**I.    The Offense Conduct**

At all relevant times, from January 2013 through March 2016, Caspersen was employed in the secondary advisory group at Park Hill Group, where he provided services to private equity fund investors and managers seeking portfolio liquidity,

1

unfunded commitment relief, and investments in the secondary market.  (PSR ¶ 9).

Beginning in November 2014 and continuing through his arrest in late March 2016, Caspersen engaged in a Ponzi-like scheme to defraud more than a dozen investors, including his close friends, family members, and college classmates, by falsely claiming that their funds would be used to make secured loans to private equity firms and would thereby earn an annual rate of return of 15 to 20 percent.  (PSR ¶ 17).  As a result of the false and fraudulent representations made by Caspersen, investors wired a total of approximately $38.5 million to shell company bank accounts controlled by Caspersen.  (*Id.*).  All told, Caspersen solicited over $150 million in investments. Caspersen never used investor funds to make the secured loans that had been promised.  (*Id.*).  Instead, Caspersen used investor funds for purposes that investors had not authorized, including to make securities trades in his own brokerage account, to make periodic interest payments to earlier investors, and to make payments on an apartment and a house that he owned.  (*Id.*).

In August 2014, Caspersen began his fraudulent scheme by incorporating an entity with a name closely resembling that of a legitimate private equity fund, in order to confuse and mislead his victims.  (PSR ¶ 18).  Once the fraud was underway,

Caspersen continued to incorporate such fake entities (collectively, the "Fake Funds") with names that were identical to, or closely resembled, the names of legitimate private equity funds (collectively, the "Legitimate Funds"). (*Id.*). Despite their apparent nominal affiliation with the Legitimate Funds, the Fake Funds were merely shell companies created by Caspersen solely for the purpose of perpetrating his fraudulent scheme, and were in no way affiliated with or authorized by the Legitimate Funds. (*Id.*). In addition, Caspersen opened and thereafter controlled bank accounts for each of the Fake Funds. (PSR ¶ 19). Caspersen obtained recent quarterly and annual reports for the Legitimate Funds, and sent such reports to prospective investors to induce them into believing that their investments would be secured by the assets of the Legitimate Funds. (PSR ¶ 20). Caspersen also registered a fake domain name and set up a fake email address and telephone number for an imaginary associate named "John Nelson." (PSR ¶¶ 35-36). In truth, the assets of the Legitimate Funds were not securing the purported loans in which Caspersen was soliciting investors. (PSR ¶ 20).

Caspersen solicited investments from more than a dozen individuals with whom he had relationships of trust, including close friends, family members, and college classmates. (PSR ¶ 20). In the beginning of the scheme, and in connection with

multiple solicitations regarding purported credit facilities, Caspersen made false representations to investors, such as: (a) in recognition for his prior work with Park Hill Group, Caspersen had been offered a "friends and family" investment allocation in a security which was allegedly offered by the Legitimate Funds; (b) Caspersen was personally investing in the security, and offering it to his family and a limited number of friends; (c) the investment was a credit facility secured by a portfolio of assets owned by one of the Legitimate Funds for which Caspersen was allegedly soliciting investments; (d) the investor would receive quarterly interest payments, ranging from 15 to 20 percent; (e) the investment was practically risk-free, as the loaned funds would remain in a bank account; and (f) the investor could withdraw the principal at any time with 90 days' notice.  (PSR ¶ 20).  The purported involvement of the Legitimate Funds was an attractive selling point for investors. (*Id.*).

Later, as the scheme evolved, from July 2015 through March 2016, Caspersen also made the following additional misrepresentations in soliciting investors in connection with a purported investment opportunity in one of the Fake Funds: (a) a multi-national firm headquartered in London that invests in the private equity secondary market by buying and selling partnership interests in third-party funds (the "Firm") wanted

to purchase secondary ownership interests in one of the legitimate funds; (b) due to uncertainty that the Firm could buy out all the original investors, Park Hill Group offered to make a loan to the Firm; (c) the Firm agreed to take a loan from Park Hill Group; (d) Caspersen and Park Hill Group were working on behalf of the Firm to solicit investors for the loan; (e) at some point after the Firm agreed to take the loan, it transpired that the Firm did not need the loan in order to purchase the secondary private equity interests; (f) because the Firm had already agreed to the loan, the Firm was obligated to pay interest on the loan; and (g) the loan was risk-free, as it was collateralized by the assets of the Firm.  (PSR ¶ 22).  As with the earlier solicitations in the Fake Funds, investors were similarly misled by the purported involvement of a Legitimate Fund in this investment.  (*Id.*).

Neither the Firm, Park Hill Group, nor any of the Legitimate Funds had any knowledge of, role in, or affiliation with the Fake Funds that Caspersen created.  (PSR ¶ 23).  They were merely fabrications that Caspersen used to trick his victims into making "investments" which Caspersen then misappropriated.

Caspersen received approximately 18 payments, in a total amount of approximately $38.5 million, from more than ten individuals and entities for investments in the Fake Funds.

(PSR ¶ 49).  Some individuals and entities made investments in more than one of the Fake Funds.  (*Id.*).  In addition, Caspersen attempted (unsuccessfully) to solicit approximately $110 million more in the Fake Funds using similar misrepresentations.  (*Id.*).

As Caspersen well knew, the representations he made to investors were false.  (PSR ¶ 50).  Notwithstanding Caspersen's statements to the contrary, Caspersen never used any investor funds to make a loan to any entity, or otherwise invest in, any fund or investment vehicle associated with any private equity fund.  (*Id.*).  Rather, Caspersen operated a Ponzi-like scheme in which he misappropriated investor funds and converted them to his own use and use by others, including by using investor funds to meet Caspersen's periodic interest payment commitments to earlier investors.  (*Id.*).

Caspersen used the money that he stole from his investors to pay off the mortgage and two home equity loans that he had taken out on his Manhattan co-op (a total of approximately $2 million in funds traceable to investor deposits); to make payments on a $3 million house in Bronxville (a total of approximately $1 million in traceable funds); to make transfers to his wife, Christina (approximately $1.25 million in traceable funds); and — most significantly — to trade options in his personal brokerage accounts.  (PSR ¶¶ 52-56).

6

More specifically, Caspersen traded heavily in options based on the Standard & Poor's Depository Receipts S&P 500 Exchange Traded Fund, which has the ticker symbol "SPY." (PSR ¶ 52). Caspersen made, and then lost, over $100 million in such trading. (PSR ¶ 56). For example, in mid-February 2016, Caspersen's brokerage account contained nearly $120 million cash, an amount which would have been more than sufficient for Caspersen to repay all of his investors (and to keep a significant fortune for himself). (*Id.*). Rather than repay his investors, however, Caspersen continued trading in options based on the performance of the S&P 500 Index and proceeded to lose nearly the entire $120 million. (*Id.*).

In addition to the above-described fraud on his investors, Caspersen engaged in a separate but related fraud, whereby he misappropriated millions of dollars from his employer to cover up his trading losses. On July 24, 2015, Caspersen opened a bank account under the name "PHG Operating LLC," which account was controlled by Caspersen for his own benefit and was unknown to Park Hill Group (the "Fake PHG Account"). (PSR ¶ 58). Into this account, he diverted a total of nearly $9 million that should have been paid to Park Hill Group by two of its clients. (PSR ¶¶ 59-62). Caspersen then transferred nearly all the embezzled funds into his brokerage account, to execute options trades for his own benefit. (PSR ¶¶ 59-62). In

November 2015, Caspersen used funds he had received from investors to repay Park Hill Group the nearly $9 million he had misappropriated.  (PSR ¶¶ 61-62).

## II.  The Plea Agreement

On July 6, 2016, the defendant pleaded guilty pursuant to a plea agreement (the "Plea Agreement").  As set forth in the Plea Agreement, the defendant and the Government agreed that the defendant's adjusted offense level is 34, calculated as follows: a base offense level of seven increased by 22 levels because the actual loss attributable to the defendant's conduct was more than $25,000,000 but was not more than $65,000,000; a two-level increase because the offense involved ten or more victims; a two-level increase because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means; a four-level increase because the offense involved a violation of securities law and, at the time of the offense, the defendant was either an officer or director of a publicly traded company, a registered broker and dealer, or a person associated with a broker and dealer, or an investment advisor, or a person associated with an investment advisor; and a three-level reduction for acceptance of responsibility.  (PSR ¶ 5).  Based on an offense level of 34 and a Criminal History Category of I, the parties agreed that the applicable Guidelines range was 151 to 188 months' imprisonment.

(*Id.*).  The Probation Office agrees with the parties'
calculation of the offense level and Guidelines, and recommends
a sentence of 84 months' imprisonment.  (PSR at 38).

The defendant agreed to the entry of a money judgment
against him in the amount of $45,173,729 (representing the
amount of money taken in by the defendant), and the forfeiture
of all property which constitutes and is derived from the
offenses including but not limited to, all right, title and
interest of the defendant in the following specific property:
(a) any and all funds on deposit in Account Number 80000815267,
in the name of Christina Caspersen, held at First Republic Bank;
(b) $532,336.00 in United States currency, representing the net
proceeds of the sale of the real property located at One Library
Lane, Bronxville, New York, 10708; and (c) all right, title, and
interest in the single residential co-op unit 7A, located at 175
East 62nd Street, New York, New York, 10065.  (PSR ¶ 5).  The
Court entered a Consent Preliminary Order of Forfeiture as to
Specific Properties/Money Judgment on July 7, 2016.  (Docket No.
19).

In addition, the defendant has agreed to pay
restitution in an amount no less than $36,258,374 (representing
the net loss).  (PSR ¶ 5).  A proposed Order of Restitution,
with the names of the victims under seal, will be provided to
the Court.

**ARGUMENT**

**I.     Calculation of the Guidelines Range Provides a Useful Frame of Reference**

A sentencing court must begin by calculating the applicable Guidelines range.  *See United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence.").  In this case, calculation of the Guidelines yields a fair and rational starting point for determining the appropriate sentence.  *See United States* v. *Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd mem.*, 301 Fed. App'x 93 (2d Cir. 2008) ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable.").  The Guidelines calculation, to which the parties have agreed, is determined largely by four factors: the loss amount, the number of victims, the defendant's use of sophisticated means, and the defendant's position at an investment bank.

Economic loss serves a suitable starting place for assessing culpability because it serves as a useful – though certainly not dispositive – proxy for viewing the magnitude of the crime.  Here, Caspersen obtained a net amount of $36,258,374

from more than 10 victims over the course of 18 months.  In fact, Caspersen actually defrauded his victims of $45,173,729, but that amount is reduced by the payments he made to certain victims before the crime was discovered.  Moreover, Caspersen attempted to obtain an additional $110 million, but was ultimately not successful.  Even courts that have criticized the Sentencing Guidelines as excessively punitive toward white-collar defendants have acknowledged that the scope of the economic loss should be a factor considered, among others, in fashioning an appropriate sentence.  Furthermore, the criticisms that are leveled at the loss Guidelines – namely that they overstate the true loss by including theoretical losses, or losses beyond the defendant's control – do not apply in this case.

The loss figure upon which the parties have agreed – approximately $36 million – does not exaggerate the amount of financial harm to Caspersen's victims.  If anything, it arguably understates it.  The $36 million loss figure includes only actual losses that were known to, and intended by, the defendant.  *Cf. Adelson,* 441 F. Supp. 2d at 509 ("[T]he precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart.  The problem is further exacerbated by the fact that the

ordinary measure of loss in a criminal securities fraud case is the decline in the price of stock when the fraud is revealed."); *United States* v. *Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2013) (in an insider trading case, criticizing the Government's position in adding 18 points for "the resultant but unpredictable monetary gains made by others, from which Mr. Gupta did not in any direct sense receive one penny."). Here, Caspersen knowingly extracted every penny of the $48 million that he took in from his victims by means of elaborate schemes, then spent substantial sums to make payments on his Manhattan apartment and his Westchester house, with the remainder financing what he characterizes as his addiction to options trading.

Caspersen argues that his loss guidelines are, in part, the result of bad "luck." (Dft. Ltr. at 28 n.25). He argues that if his crimes had been detected earlier, his losses would not have been as large. Notwithstanding that this argument ignores the many ways in which Caspersen deliberately covered his tracks to avoid getting caught, it also ignores the fact that the converse is also true: if Caspersen's fraud had not been uncovered in March 2016, his losses may well have been even greater. As recently as March 21, 2016 — just five days before his arrest — Caspersen was placing telephone calls and sending emails to his contacts at a large private equity firm,

seeking to confirm that the firm would close on its proposed $50 million investment.  Indeed, it is possible the firm would have done so – wiring another $50 million in victim money into the defendant's coffers – but for the intervention of the Government.

In fact, although the Government has stipulated that the loss amount for purposes of the Guidelines is more than $25 million but not more than $65 million, this calculation does not account for the funds that Caspersen solicited but did not actually obtain (for example, the aforementioned $50 million). The Government stipulated to the lower loss range on the unusual facts of this case because of the 2015 Amendments to the Sentencing Guidelines, which adopted the Tenth Circuit's subjective standard of intended loss as set forth in *United States* v. *Manatau*, 647 F.3d 1048, 1050-51 (10th Cir. 2011) ("The difference between . . . intent and knowledge is . . . the difference between the man who wills that a particular act or result take place and another who is merely willing that it should take place.") (citations, internal quotations and brackets omitted).  Defense counsel argues that Caspersen did not subjectively intend to deprive his victims of money. Rather, he believed that his bets would succeed and he would repay his victims.  Even if an objective observer could see the fallacy of that belief, it is the subjective belief of the

13

defendant that matters for purposes of intended loss.[1]  On the one hand, there are some facts that appear to support the argument that Caspersen did not intend to permanently deprive his victims of their funds.  For example, he made quarterly "interest payments" to investors.  And in March 2016, had Caspersen obtained the $50 million investment he was soliciting at the time, he could have used it to satisfy an earlier investor's redemption request.  On the other hand, because of the way the intended loss is now construed for Guidelines purposes, the loss amount attributed to Caspersen's fraud arguably understates the seriousness of the offense.  Significantly, it does not include the many failed attempts that Caspersen made to solicit additional funds — in the staggering total amount of $110 million — both from individuals and entities he had already defrauded, and from others.

The second factor that affects the Guidelines calculation in this case is that the crimes affected ten or more victims.  There is no double counting and no inclusion of victims that were not foreseeable to Caspersen.  In fact, Caspersen personally knew each of the victims, and also knew, for example, that some victims were investing on behalf of their

---

[1] Notably, this concern does not apply to any actual loss by victims.

spouses, parents or children.  The associated two-point
enhancement is appropriate and deserved.

        The third factor that figures into Caspersen's
Guidelines calculation – a two-point enhancement for his use of
sophisticated means to commit the crimes – is also a textbook
example of the proper application of this factor.  The
application notes state that "[c]onduct such as hiding assets or
transactions, or both, through the use of fictitious entities,
corporate shells or offshore financial accounts" are examples of
sophisticated means.  U.S.S.G. § 2B1.1(10)(C), app. n. 9(B).
Criminal conduct that is carried out through the use of
sophisticated means is more difficult to uncover.  In this case,
Caspersen set up bank accounts in the name of fake funds that
were intended to resemble real funds (in connection with the
securities fraud charged in Count One), and set up an account in
the name of "PHG Operating LLC" (in connection with the wire
fraud charged in Count Two).  Caspersen also registered a fake
domain name and set up a fake email address and telephone number
for an imaginary person named "John Nelson."  In connection with
his attempt to bring in an additional investment of $50 million
in late 2015 and early 2016 (which was ultimately not
successful), Caspersen used scanned copies of the driver's
licenses of a good friend (who had already fallen victim to
Caspersen's fraud) and an acquaintance (+identified as

15

"Individual-7" in the Complaint).  Unbeknownst to these two
individuals, Caspersen tried to pass them off as officers of
Caspersen's fake fund.  Caspersen misappropriated their
identities and used them to create fake documents to lure
additional investors into his scheme.  This is plainly egregious
conduct warranting substantial punishment.

     Finally, the fourth factor that increases Caspersen's
offense level is his status as, or association with, a
registered broker dealer.  Caspersen argues that the four-point
increase under Section 2B1.1(b)(19)(A) "fits the case poorly"
because Caspersen did not perform the functions typically
associated with a registered broker dealer, and in fact, under
current SEC Guidelines, "he would not be required to register as
a broker dealer." (Dft. Ltr. at 27 n.24).  Caspersen overlooks
the fact that this enhancement also applies to him because he is
"a person associated with a broker dealer," namely, he was a
registered representative at Park Hill Group.  *See* U.S.S.G. §
2B1.1(b)(19)(A)(ii).  Caspersen's affiliation with this well-
regarded boutique investment bank certainly worked in his favor
when he sought to attract investors to his phony investment
vehicles, by lending an air of prestige and legitimacy to his
operations.  For example, when he communicated with his victims
by email, he used his Park Hill Group email account.  Contrary

16

to defense allegations, the broker dealer enhancement is properly applied to the facts of this case.

## II. A Guidelines Sentence is Consistent with the Goals of Sentencing, the Characteristics of this Defendant, and the Nature of this Offense

After calculating the applicable Guidelines range, a court may impose a sentence above or below the Guidelines range in order to meet the sentencing goals set forth in Section 3553(a), if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into considering by the Sentencing Commission." U.S.S.G. § 3553(b)(1). Here, because no such circumstance exists, a sentence within the Guidelines range of 151 to 188 months' imprisonment is warranted.

### A. The Defendant's Crime Was Long-Running, Significant and Elaborate

The first factor that Section 3553(a) requires the Court to consider is the "nature and circumstances of the offense." The fraud scheme described in the Information spanned more than a year and a half, from the summer of 2014 until his arrest in March 2016. As time went on, the fraud became more elaborate and calculated, requiring extensive planning and cunning deception, such as the creation of fake letters, contracts, entities, bank accounts, domain names, and email

17

addresses; the use of the identities of two other individuals; and the services of an unsuspecting junior employee.

While the defendant's criminal conduct is charged in the form of two counts, in reality, the defendant committed dozens of acts of dishonesty and fraud. Caspersen, acting alone, planned and carried out his scheme from beginning to end. He was the sole originator, perpetrator and beneficiary of his crimes. Unlike other investment fraud schemes, Caspersen's scheme did not begin (or ever operate) as a legitimate enterprise. The promissory notes that he peddled to investors were pure fabrications. And, unlike other investment fraud defendants, who never got back in the black to even consider repaying their investors, Caspersen had numerous opportunities to make his investors whole. Indeed, at one point he had $120 million available. Instead, he kept playing stock market roulette with his investors' money, as well as siphoning millions off for his personal expenses.

**B. The Defendant Abused the Trust of those Closest to Him**

The magnitude of the losses caused by Caspersen's illegal activity – over $35 million – is undoubtedly very significant. The defendant urges the court to view the offense as having minimal impact on the victims and the public. Notwithstanding that the defendant's victims were well-off, nothing could be further from the truth.

Perhaps the most appalling aspect of this case is the way in which the defendant betrayed the trust of his victims, and the apparent ease with which he defrauded them, often repeatedly.  In 2012, Caspersen borrowed $2.25 million from his mother and one of his brothers, supposedly for a risk-free "friends and family" investment opportunity.[2]  (PSR ¶ 115).  Instead, Caspersen lost the funds he had borrowed through risky options trading in his own account.  (*Id.*).  In late 2012, when he was unable to repay the loans, Caspersen initially told his family that the money had been lost through a technical error at his brokerage house.  (*Id.*).  Caspersen later admitted that he had lost the money by gambling it away on options trading.[3]  As a result of this admission, Caspersen's family urged him to undergo mental-health treatment.  (*Id.*).

Presumably the defendant felt some level of remorse and shame when he was forced to admit his conduct to his family.  Clearly, however, he did not let whatever pangs of conscience he felt deter him from future fraud.  In 2014, Caspersen resumed his criminal conduct, on a larger and more sophisticated scale.

---

[2] Caspersen's 2012 fraud was not charged in the Information and resulted in no loss to the victims; it is included here as conduct relevant to sentencing.

[3] Caspersen ultimately made these victims whole.

19

The individuals Caspersen targeted for the following 18 months included his close friends, his former classmates, and — once again — his family.  Outwardly, Caspersen displayed all the indicia of trustworthiness – his family name, his degrees from Groton, Princeton and Harvard, his position at a prestigious boutique investment bank, his connections in the world of private equity – and he shamelessly exploited the confidence his victims placed in him.  Although Caspersen corresponded with his victims using his professional email account, his requests for money were intermingled with personal banter about mutual friends, holidays, and family life – clearly a calculated ploy to get his victims to let down their guard and enrich himself.  A victim who was a good friend of Caspersen's has expressed that Caspersen took advantage of their relationship to induce the victim to invest, and that Caspersen carried out the fraud in a highly calculated, rather than impulsive, manner.  (PSR ¶¶ 69-70).  Caspersen preyed on his victims' trust.[4]

---

[4] Although otherwise warranted, an abuse of trust Guidelines enhancement is inapplicable here because of the enhancement for committing the crime while associated with a broker and dealer. *See* U.S.S.G. § 2B1.1(b)(19), app. n. 15(C).

### C. Not Only Did Caspersen Lose the Money and Abuse the Trust of His Victims, He Also Risked Destroying their Professional Reputations

There is yet another significant way in which Caspersen harmed his victims.  For many of them, even worse than the financial and emotional ramifications of Caspersen's conduct is the reputational harm they have suffered, or would suffer, as a result of being identified as victims of this highly-publicized fraud.  These victims are themselves investment professionals, whose most valuable asset is their perceived ability to exercise good judgment in evaluating potential opportunities for their clients.  An online opinion piece about Caspersen's scheme published shortly after his arrest provides insight into the harsh judgments that Caspersen's victims would face if exposed.  "[M]ost investors who are at all sophisticated realize that the risk-free 15 percent return is itself a red flag."[5]  The piece goes on to deride "the silliness of the investment opportunity itself" and remarks that "the pitch was pretty ridiculous."[6]  Several victims have expressed to the Government that they fear their careers would be seriously jeopardized if their identities became public, and expressed

---

[5] https://www.bloomberg.com/view/articles/2016-03-28/real-investment-adviser-sold-some-fake-investments (visited on October 17, 2016, attached hereto as Exhibit A).

[6] *Id.*

21

regret that they did not feel at liberty to submit victim impact statements (which are now routinely made part of the public record) for this very reason.

### D. To Perpetrate the Fraud, Caspersen Stole the Identities of Two Individuals and Made an Unwitting Accomplice of his Junior Employee

In addition to the victim harms described above, Caspersen exploited three individuals in a less obvious fashion. The first individual was a friend of Caspersen's, who had invested money into one of Caspersen's fake funds.  The second individual was an acquaintance of Caspersen's.  Caspersen claimed that he needed a copy of each of their driver's licenses for regulatory "know your customer" purposes.  In truth, after Caspersen received the scans of their driver's licenses, he used them to solicit money from a potential institutional investor by claiming that these individuals were the president and treasurer of one of the Fake Funds, respectively, and sending the scans of their identity documents to the potential investor.  These individuals, of course, had no affiliation with any of Caspersen's fake entities, and Caspersen used their identities without their knowledge or permission.

Finally, in March 2016, Caspersen exploited his position as a partner at Park Hill Group to direct a junior employee to take actions to cover up Caspersen's fraud.  (PSR ¶ 39).  Caspersen directed his employee to speak with a

22

disgruntled investor and confirm that the investor's redemption request was being processing.  (*Id.*).  At the time, the employee had no inkling that the investment Caspersen had asked him to discuss was a sham and a fraud.  Caspersen had no compunction about jeopardizing his junior colleague's career by causing him unwittingly to further Caspersen's scheme.

### E. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

Section 3553(a) emphasizes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  This provision is meant to discourage unwarranted discrepancies in sentencing nationwide.  *See United States* v. *Frias*, 521 F.3d 229, 236 (2d Cir. 2008).  But we need not look far to see that imposition of a Guidelines sentence in this case would be consistent with sentences imposed on similarly-situated defendants.  One example is Todd Eberhard, an investment advisor and securities broker who pled guilty to defrauding his clients of a total of approximately $7 million over a ten-year period by "churning" their accounts to generate commissions and making unauthorized withdrawals from their accounts; Judge Sweet imposed a sentence of imprisonment of 160 months.  *See United States* v. *Todd Eberhard,* No. 03 Cr. 562 (RWS), 2005 WL 1384038, *4 (S.D.N.Y. June 9, 2005).  Another similar case is that of

Charles Huggins, who was convicted after trial of defrauding approximately 30 victims of $8 million in an advance-fee investment fraud scheme; Judge Stein sentenced Huggins to 10 years' imprisonment. *See United States* v. *Charles Huggins*, No. 13 Cr. 155 (SHS) (S.D.N.Y. May 24, 2015) (Docket No. 343).  By the same token, Dionysius Fiumano was convicted after trial of taking $31 million in fees from 30,000 homeowners for mortgage assistance that did not occur; Judge Keenan sentenced him to 16 years' imprisonment. *See United States* v. *Dionysius Fiumano*, No. 14 Cr. 518 (JFK) (S.D.N.Y. Sept. 16, 2016) (Docket No. 129). After being found guilty by a jury of defrauding nearly 300 victims of $17 million, plus other crimes such as racketeering and money laundering, Mikhail Zemlyansky was sentenced to 15 years' imprisonment by Judge Oetken.  *See United States* v. *Mikhail Zemlyansky*, No. 12 Cr. 171 (JPO) (S.D.N.Y. Feb. 1, 2016) (Docket No. 1892).  After pleading guilty to a fraud scheme that raised more than $9 million from investors in private placement real estate offerings, Joseph Shereshevsky and Steven Byers were sentenced to 262 months and 160 months, respectively, by Judge Chin.  *See United States* v. *Joseph Shereshevsky*, No. 08 Cr. 1092 (DC) (S.D.N.Y. Aug. 19, 2011) (Docket No. 119); *United States* v. *Steven Byers,* No. 08 Cr. 1092 (DC) (S.D.N.Y. May 10, 2011) (Docket No. 112).

The other Section 3553(a) factors — such as deterrence and incapacitation — are discussed below, in the context of responding to arguments made by the defendant in his sentencing submission.

## III.   The Mitigating Factors Presented by Caspersen Do Not Justify a Below-Guidelines Sentence

In his sentencing submission, Caspersen asks the Court to consider as mitigating circumstances his gambling disorder, the absence of a personal profit motive, his pre-arrest accomplishments, and his post-arrest rehabilitation.  None of these factors, to the extent they are factually accurate, considered either alone or in combination, remove Caspersen from the "heartland" of defendants sentenced every day by courts in this District and nationwide.

### A. The Defendant Was Not Compelled by Addiction to Commit These Crimes

For purposes of this sentencing submission, which is being submitted prior to an evidentiary hearing on the subject of Caspersen's gambling disorder, the Government does not contest the assessment, in the letters of Drs. Potenza and Goldman, that Caspersen suffered, at certain times in his adult life, from a gambling disorder, and that the disorder, when it existed, was significant.  Similarly, the Government does not dispute that a severe gambling disorder may affect an individual in some of the same ways that a substance addiction does, and

25

that there can be a correlation between severe pathological gambling and illegal activity.  And the Government assumes *arguendo* that Caspersen had a compulsion to continue gambling, and that this compulsion was a motivator to defraud and embezzle from others.

However, even accepting these facts as true, there is nothing in the defense submission or in the literature about gambling disorders that would support the notion that Caspersen had no choice but to commit fraud or that he was compelled by his disorder to engage in criminal behavior.  Caspersen's pathological gambling may have created an intense need for money, which in turn made it more difficult for him to lead a law-abiding life.  But that does not distinguish him from other defendants: all criminals have failed to resist temptation of one sort or another.  As the Supreme Court has noted:

> Prisons, by definition, are places of involuntary
> confinement of persons who have a demonstrated
> proclivity for antisocial criminal, and often
> violent, conduct.  Inmates have necessarily shown
> a lapse in ability to control and conform their
> behavior to the legitimate standards of society
> by the normal impulses of self-restraint; they
> have shown an inability to regulate their conduct
> in a way that reflects either a respect for law
> or an appreciation of the rights of others.

*Hudson* v. *Palmer*, 468 U.S. 517, 526 (1984).

Caspersen does not – and, in fact, he cannot – claim that his criminal conduct was the result of an irrestible

impulse.  Rather, it was a product of his own volition, a choice that was complicated by his addiction to gambling.  The Government is not asking the Court to punish Caspersen for having a gambling disorder.  Instead, the Government is asking the Court to hold Caspersen accountable for criminal acts that countless other addicts – lacking Caspersen's intelligence, education, and resources - have resisted committing.  There are many other individuals who, having spent all their money and even taken on debt to feed their addictions, do not cross the line into defrauding and stealing from others.

### B. The Defendant is a Repeat Offender Who Rejected Opportunities to Address his Gambling Disorder

Over the course of 17 years, Caspersen had multiple opportunities that lent themselves well to making a concerted effort to overcome his disorder.  But Caspersen's adult life is a history of opportunities he failed to embrace.

For example, the turn of events in late 2012 provided a chance — and a motivation — for the defendant to take steps to overcome his gambling addiction.  In the summer of 2012, Caspersen defrauded his mother and brother of $2.25 million and used the money for trading.  After he lost the entirety of their supposed "investment," he admitted that he had lost the money through trading.  His family persuaded him to seek counseling.

27

By this point, it was apparent to Caspersen that he
had reached a new low – stealing from his family – and had
barely averted a catastrophe.  Caspersen could see the writing
on the wall: he had already lost approximately $19 million of
his own and his family's money through risky trading.  His
gambling problem had been exposed to his family, presumably
provoking feelings of guilt, shame and remorse.  Yet his family
remained supportive.  They encouraged him to get help.  They
suggested he put his wife in charge of the family's finances.
He was about to embark on a new job opportunity, at Park Hill
Group.  The circumstances were ripe for Caspersen to put his
life back in order.

And for a while, things looked promising: for most of
2013, Caspersen abstained from trading.  (Def. Ltr. at 11).
During this period, Caspersen had the opportunity to apply his
considerable talents, his family support, and his vast resources
to ridding himself of his gambling problem which, by that point,
had already motivated him to break the law by stealing from his
own family.  But unfortunately Caspersen passed up this
opportunity, as he passed up many others.  He did not commit
meaningful to counseling, attending only a handful of sessions
of therapy in late 2012 and early 2013.  (Def. Ltr. at 11).
During those few sessions, Caspersen appears to have hid the
extent of his gambling problem from his therapist.  Dr. Goldman,

the psychiatrist who has been treating Caspersen since April 2016, notes in his report that, prior to his arrest, Caspersen "had never seriously attempted to stop [gambling] previously." (Def. Ltr. App'x B at 4).

Although Caspersen has no prior criminal history, the term "first time offender" does not capture the pattern of his criminal conduct. Caspersen was exposed for defrauding his mother and brother of $2.25 million. The opprobrium of his family appears to have acted, at best, as a temporary deterrent. After a hiatus of several months in 2013, Caspersen again gave in to the temptation of risky options trading, and the following year, he resumed his illegal conduct.

Caspersen had a clear chance to turn his life around. Just as those suffering from difficult substance abuse issues and addiction can take steps to mitigate against the possibility of relapse – avoiding particular people, places or occasions, for instance – Caspersen, had he really wanted to reform, would have shut down his brokerage account, or at least given it over to a responsible family member. Instead, in late 2013, when he received his year-end bonus from Park Hill Group, he began trading options again. In the summer of 2014, he began to lay the foundation for his renewed criminal activity. He set up shell companies and bank accounts to go along with them. In September 2014, Caspersen solicited $250,000 from one of his

brothers for a sham investment, which funds Caspersen re-paid in December 2014, claiming the investment had fallen through.  By November 2014, Caspersen was contacting friends with fake "investment" opportunities, and from there the fraud continued to grow until his arrest.

### C. This Court, and Other Courts, Have Rejected Problem Gambling as a Mitigating Circumstance at Sentencing

This Court has observed that "[c]ompulsive gambling is a real and significant psychological disorder." *United States* v. *Carucci*, 33 F. Supp. 2d 302 (S.D.N.Y. 1999) (Rakoff, J.) (under a mandatory Guidelines regime, denying a request for a departure for diminished capacity based on compulsive gambling problem).  In *Carucci*, the defendant argued not only that compulsive gambling provided an economic incentive for his crime, but also that he engaged in insider trading "with its high stakes and high risk" as a form of "substitute gambling he could neither resist nor renounce." *Id.* at 303.  This Court found that "when it came to *gambling*, [the defendant's] ability to exercise either reason or control was significantly impaired." *Id.* at 302 (emphasis added).  But this Court rejected the argument that the defendant was similarly compelled to commit the crime of insider trading, finding that "[w]hen invited by his colleagues to participate in this illegal trading, the defendant, though recognizing the wrongfulness of

such conduct, yield to temptation without anything like a Dostoevskian struggle." *Id.* at 303.

The same is true of Caspersen – he may have felt compelled to engage in risky options trading as a form of gambling, but it does not follow that he was similarly compelled to perpetrate an elaborate multi-million-dollar fraud on his colleagues, friends and family members.  By the end of 2012, Caspersen knew that his urge to gamble was so strong that it could lead him to defraud his own family.  Like the defendant in *Carucci*, Caspersen did not engage in a meaningful "struggle" to shield himself from the temptations to engage in illegal conduct that arose, nor did he take concrete steps to suppress his impulses as they occurred.  In fact, not only did he not struggle, but he "never tried." (Letter of Dr. Goldman, Def. Ltr. App'x B at 4).  Caspersen is therefore no more deserving of leniency at sentencing for any gambling disorder from which he suffers than was Carucci.

In analyzing a similar request for a downward departure based on diminished capacity, Judge Kaplan astutely observed:

> This Court is skeptical of whether the guideline should be construed in a manner to permit a downward departure in cases where reduced mental capacity merely results in conduct that creates the motive for the criminal behavior as distinguished from conduct constituting the criminal behavior.

31

> The implications of doing so would be vast.
> Defendants charged with a wide array of
> crimes might seek downward departures
> because they were, for example, compulsive
> shoppers who turned to stealing, running a
> house of prostitution, or insider trading,
> among other crimes, only after spending all
> of their assets.

*United States* v. *Grillo*, No. 03 Cr. 0249 (LAK), 2003 WL

22999219, at *2 (S.D.N.Y. Dec. 22, 2003) (Kaplan, J.).  Although

the Guidelines are no longer mandatory, Caspersen's request for

a variance should be analyzed in an analogous fashion.  The

following passage from *Grillo* is particularly apt: "All crimes

are committed out of motives.  Many are committed out of motives

created by behavior that might be described as addictive or

compulsive.  The Court is unpersuaded that this defendant's

situation is outside the heartland occupied by those who commit

like crimes."  *Id.*  The Government respectfully submits that

Caspersen's gambling problem does not distinguish him from

others who have similar problems.

Moving into the post-*Booker* era, the circumstances of

Caspersen's offense are very similar to those in *United States*

v. *Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009) (Marerro, J.)

*aff'd*, 381 F. App'x 60 (2d Cir. 2010).  In *Regensberg*, the

defendant was convicted at trial of securities fraud and wire

fraud offenses.  At sentencing, the defendant moved for a

downward departure and a downward variance for reasons including

his pathological gambling disorder.  *Id*. at 307.   In connection

with sentencing, Judge Marrero wrote a lengthy and thoughtful

opinion, much of it relevant to the instant case.   For example:

> Most of [the defendant's] victims were not
> strangers or even acquaintances.  Rather,
> they were close friends who knew him for
> years, and were members of the same
> synagogue where he held a position of
> authority.  They relied on their intimate
> history in trusting him with their money,
> and Regensberg's abuse of that trust is what
> enabled him to perpetuate his fraudulent
> scheme.  While Regensberg explains this
> conduct, in part, as a result of a
> pathological gambling addiction, such an
> affliction does not outweigh the egregious
> nature of his fraud.  He did not swindle
> strangers, but people those closest [*sic*] to
> him.  When asked for documentation to
> support assurances that he had funds to pay
> back the investors, he lied and even
> fabricated a bank record in a desperate
> effort to hold back his investors from
> learning the truth.

*Id*. at 311.  Judge Marrero ultimately sentenced the defendant to

100 months, only slightly below the Guidelines range of 108 to

135 months.  *Id*. at 312-13.

More recently, after recognizing the Court's ability

to depart from the Guidelines on the basis of a gambling

addiction and a substance abuse addiction, the Court in *United*

*States* v. *Gonzales* declined to do so, remarking:

> [T]he nation's prisons and criminal justice
> system contain many who have some addiction,
> mostly drugs and alcohol.  Even gambling
> addiction is just a reason for a need for
> money, and almost everyone in the criminal

33

> justice system needs money.  This case falls
> into the heartland of cases that the Court
> sees, the District sees, and the federal
> courts everywhere in the country see.

*United States* v. *Gonzales*, 163 F. Supp. 3d 1078, 1124 (D.N.M.
2016) (ultimately sentencing the defendant to a below-Guidelines
sentence, based on a combination of eleven factors, including
the defendant's mental health and substance abuse).

 The Government submits that these cases, taken
together, reflect the proposition that problem gambling does not
excuse resulting criminal behavior for sentencing purposes.

### D. The Case Law about Drug Addiction as a Mitigating Circumstance Provides Additional Reason to Impose a Guidelines Sentence in this Case

 In its submission, the defense acknowledges the policy
adopted by the Sentencing Commission that "[a]ddiction to
gambling is not a reason for a downward departure." U.S.S.G. §
5H1.4.  The defense also points out, correctly, that the
Commission provided no explanation for its adoption of that
policy in 2003.  But to the extent that a gambling disorder is
akin to a drug addiction, it is instructive to consider the
Commission's position on substance addiction.  The Commission
states that "[d]rug or alcohol dependence or abuse ordinarily is
not a reason for a downward departure," and "[s]ubstance abuse
is highly correlated to an increased propensity to commit
crime." *Id.*  This correlation also holds true for pathological

34

gambling: the defense cites studies that "find a high correlation between severe pathological gambling . . . and illegal activity." (Def. Ltr. at 4 n.3).

Given the similarities between gambling addiction and substance dependence, it is helpful to consider how courts have treated substance abuse and dependence when these circumstances have been raised as mitigating circumstances at sentencing. For example, where the defendant was "a chronic drug addict and petty thief," who had pled guilty to being a felon in possession of a firearm, this Court

> imposed a slightly more lenient sentence — 21
> months — chiefly because the Court gave greater
> weight than the Guidelines would have permitted
> to the sympathetic, even pitiable features of the
> defendant's background, such as his repeated but
> unsuccessful attempts to rid himself of his
> recurrent heroin addiction and his refusal, even
> in the throes of such addiction, to become a drug
> dealer or to engage in theft except in moments of
> desperation.

*United States* v. *Marrero,* 325 F. Supp. 2d 453, 457 (S.D.N.Y. 2004) (Rakoff, J.) (imposing a sentence slightly below the low end of the Guidelines range, which was 24 months). But Caspersen is different from the defendant in *Marrero*: Caspersen *did not* make repeated attempts to rid himself of his gambling addiction, and he *did* engage in a massive and sophisticated fraud to maintain his addiction. In *Marrero*, this Court varied downward by three months in fashioning Marrero's sentence; it

35

would be inconsistent to vary downward in this case, in which the defendant's background does not have nearly the same "sympathetic, even pitiable features" that Marrero's did. Instead, Caspersen has enjoyed many advantages throughout his life, including his wealth, his education, and his professional success.

### E. The Circumstances of the Defendant's Life Do Not Distinguish Him from the Typical White Collar Defendant

Caspersen has submitted numerous letters from family, friends, acquaintances, former employers and employees, members of his GA and AA groups, and clergy, among others.  Even some of his victims – such as his mother and the MacRae family – have written letters of support.  The writers universally claim that Caspersen's arrest and guilty plea came as a complete shock to them, and that his illegal conduct was entirely at odds with the honest, generous, humble, loyal and kind individual they knew him to be.  Many of the writers assure the Court that they will do everything in their power to support Caspersen and his family during and after whatever sentence the Court imposes.

It is, of course, entirely appropriate for the Court to take these letters into account in connection with sentencing.  However, the Government asks that, in so doing, the Court also consider the following three points.

36

First, the many attestations to Caspersen's good character do not set him apart from the typical white collar defendant.  Rather, this collection of letters:

> falls into a pattern advanced by a subset of the white collar criminal.  This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant.  The list of their achievements and virtues is long and impressive.  Let us count the ways.  At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends.  At work, they are looked up to as outstanding professionals and business partners.  To their community's charities and public causes they are generous patrons and sponsors.

*Regensberg,* 635 F. Supp. 2d at 308.  In other words, and as the Court well knows, the letters proffered by Caspersen are typical of the letters submitted by white collar criminals, and do not set Caspersen apart from other similarly-situated defendants.

Second, many of Caspersen's supporters state that Caspersen was not motivated by greed to commit the fraud.  What may not be known to these individuals is that Caspersen used approximately $2 million of victim money to pay off the mortgage and home equity loans he had obtained on his Manhattan apartment.  He also used crime proceeds to purchase a $3.2 million house in Bronxville, into which he and his family were planning to move around the time of his arrest.  Finally, he transferred over $1.25 million in crime proceeds to his wife.

To say that Caspersen did not gain from his fraudulent activity
ignores the fact that he used a significant portion of the crime
proceeds to benefit himself and his family.

        Third, with the exception of Caspersen's wife and a
couple from St. Louis, not a single one of the letter writers
was willing to come forward after Caspersen's arrest to co-sign
his $5 million appearance bond or to post property to secure
that bond.  The original bond was to be co-signed by three
financially responsible persons, and to be secured by $50,000 in
cash, as well as by the defendant's Manhattan co-op and
Bronxville house.  As the letters themselves demonstrate, there
are many individuals — now claiming to be ardent supporters of
Caspersen — who had the means to post $50,000 cash to secure
Caspersen's release, or to sign the appearance bond.  Yet no one
did.  It took approximately two weeks for Caspersen to find
anyone (other than his wife) willing to co-sign his bond, or
post any property.[7]  While writing a letter to the Court in
connection with sentencing requires very little effort and no
self-sacrifice, risking one's money or property for a friend or
family member is a much more difficult and meaningful sign of

---

[7] On the day of Caspersen's presentment, his bond was co-signed
by his wife and by one of his brothers, Finn Caspersen, Jr., who
had also agreed to post property.  However, shortly thereafter,
Finn Caspersen communicated to the Government that he wanted to
be removed as a co-signer and would not post any property.  No
other family members came forward to replace him.

support – and one which none of Caspersen's friends and family was willing to undertake.

For these reasons, the letters submitted in support of Caspersen should be read with a critical eye.

### F. A Guidelines Sentence is Necessary to Afford Just Punishment and Adequate Deterrence to Criminal Conduct

Many of the letters submitted on Caspersen's behalf make some variation of the argument that Caspersen has already been punished enough through the reputational harm he has suffered since his arrest.  But "it is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."  *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012).  Similarly, the loss of his professional licenses, the legal fees he has incurred, and the felony convictions associated with his name are not factors this Court should take into account.  "None of these things are his sentence.  Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment."  *United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (quotations omitted); *see also United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing

discounts on account of economic or social status."). And, as
the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are
> authorized. Business criminals are not to be
> treated more leniently than members of the
> "criminal class" just by virtue of being
> regularly employed or otherwise productively
> engaged in lawful economic activity. It is
> natural for judges, drawn as they (as we) are
> from the middle or upper-middle class, to
> sympathize with criminals drawn from the same
> class. But in this instance we must fight our
> nature. Criminals who have the education and
> training that enables people to make a decent
> living without resorting to crime are more rather
> than less culpable than their desperately poor
> and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

Finally, the Government submits that the need for
just punishment and general deterrence calls for a Guidelines
sentence. "While all the other factors under section 3553
partake to a lesser or greater degree of policy considerations,
'just punishment' taps a deeper vein." *Gupta*, 904 F. Supp. 2d
at 355. Here, Caspersen committed a massive and sophisticated
fraud, taking in more than $48 million from a dozen victims over
an 18-month period, and attempted to take in $110 million more.
It is not the case, as defense counsel contends, that "greed
played no role" in this case. (Def. Ltr. at 28) (emphasis in
original). As set forth in the PSR, Caspersen used some of the
funds he obtained illegally from his fraud scheme to pay the
mortgage and home equity loans on his Manhattan co-op, to make

40

payments on his Bronxville home and to provide for his wife.
(PSR ¶¶ 52-56).  These payments, from which Caspersen
benefitted, totaled upwards of $4 million.  This behavior
warrants punishment.  Moreover, Caspersen refused to follow
through on steps to work on his weaknesses and now uses those
same weaknesses to justify and minimize his crimes.  The public
outcry over a man given all the breaks in life, beginning at
birth, who cast them all aside to repeatedly defraud his
friends, family and colleagues, has been completely justified.
And "[w]hile no defendant should be made a martyr to public
passion, meaningful punishment is still necessary to reaffirm
society's deep-seated need to see justice triumphant." *Gupta*,
904 F. Supp. 2d at 355.

<u>**CONCLUSION**</u>

       For the reasons set forth above, given the nature and
circumstances of the offense, a Guidelines sentence is
sufficient but not greater than necessary to meet the ends of
sentencing.

                         Respectfully submitted,
                         PREET BHARARA
                         United States Attorney

                 By:  /s/ Christine I. Magdo
                         Christine I. Magdo
                         Assistant United States Attorney
                         (212) 637-2297

cc: Paul Shechtman, Esq.