WALL STREET

# Real Investment Adviser Sold Some Fake Investments



21    MARCH 28, 2016 7:53 PM EDT

By Matt Levine

There are a lot of creative and amusing investment frauds in the world, but there is one great simple investment fraud, one original source from which all the others developed:

1. Tell people that you have a risk-free investment that will give them their money back, with 15 percent interest, any time they want.   1
2. Take their money.

Why don't people do this all the time? Well, I mean, they do. It's a pretty popular fraud. But it is usually a fairly small-scale and labor-intensive fraud, because most investors who are at all sophisticated realize that the risk-free 15 percent return is itself a red flag. Real investments are risky or uncertain or at least illiquid; the proper response to a guaranteed liquid 15 percent return is "what's the catch?"

So the charges that the Securities and Exchange Commission and federal prosecutors brought today against Andrew Caspersen are surprising in that Caspersen allegedly used exactly that pitch to take $25 million from a single hedge fund,   2   which is a level of size and sophistication where you wouldn't expect people to fall for it.   3   But here's what Caspersen's investor allegedly bought:

> The November Note stated, in part, that: (i) the SPV would pay the Foundation the principal sum of $25 million "in immediately available funds" together with interest on the unpaid principal; (ii) interest on the outstanding unpaid balance shall accrue at an annual rate of 15%; (iii) interest shall be paid quarterly; (iv) upon 90 days' notice to the SPV, the Foundation may redeem the principal sum of $25 million; (v) the SPV "shall maintain cash or cash equivalents in an amount equal to or greater than" the total of the outstanding principal and accrued but unpaid interest.

So the investor -- a charitable foundation affiliated with "a multi-national hedge fund, headquartered in New York" -- was expecting a 15 percent annual return on an investment with 90-day liquidity fully collateralized by cash. That promise is itself pretty suspicious, and Caspersen's alleged explanation of why this too-good-to-be-true opportunity was available was even weirder: Supposedly Coller Capital, a firm that buys secondary stakes in private-equity funds, had agreed to take out a loan to buy a secondary stake in a private-equity fund run by Irving Place Capital, but turned out not to need the loan, but "was obligated to pay interest" anyway because it "had already agreed to the Loan," so Caspersen was raising money to lend to Coller to just park it and pay 15 percent interest.   4   That ... doesn't really happen?

Any sophisticated investor might suspect that something was amiss, except that Caspersen himself was impeccably credentialed to pull it off. Caspersen was a managing director in the Park Hill Group, a unit of PJT Partners (and formerly of Blackstone) that really was in the business of marketing and funding secondary transactions in private-equity stakes. Irving Place investors really were selling stakes in their fund, and Coller really was reported to be a buyer. Caspersen allegedly told the investor that his own family office was investing in the loan, and the Caspersen family office really did at one point manage $1 billion.   5   The loan was -- according to the complaint -- fictitious, and Park Hill, Coller and Irving Place all had nothing to do with what Caspersen was selling. But, besides the silliness of the investment opportunity itself, the other details had the ring of truth.

I mean, not *all* the other details. After Caspersen hooked the foundation for $25 million, he tried for another score, and earlier this month he allegedly asked the

foundation for another $20 million. Again the pitch was pretty ridiculous -- another (fictitious) investor had redeemed out of the magical 15 percent notes, but Caspersen "had convinced Firm-1 [*i.e. Coller* 6 ] to re-issue the other investor's promissory note to new investors." That is, Coller had taken out a loan at 15 percent interest, realized that it didn't need the money, paid back part of the loan -- and then Caspersen convinced Coller to take out another loan that it didn't need? Come on.

The investor was, I guess, suspicious at this point, and told Caspersen that he wanted to speak to "Individual-3," supposedly a Coller employee who had signed the documents for the first loan:

> In response, CASPERSEN sent an email to Individual-1 [*the hedge-fund employee who had invested the $25 million*] and to an email address containing both the name of Individual-3 [*the supposed Coller employee*] and the name of Firm-1 [*Coller Capital*] (the "Email Address"), to set up a conference call for later that day.

You can probably guess where the Justice Department is going with this:

> Later that day, a representative of Firm-3 (Individual-1's employer) informed Individual-1 that the domain name of the Email Address had been registered that same morning, approximately 20 minutes after Individual-1 requested a telephone call with Individual-3, and that the domain name was not the same as Firm-1's actual domain name. Individual-1 also was told that a representative of Firm-3 had called Firm-1's New York office and was told that no one named Individual-3 worked at Firm-1.

Coller's actual domain name is collercapital.com. I hope the fake e-mail address was, like, john.doe@noreallyitscollercapital.com. On learning it was fake, the investor called Caspersen, who I have to say handled it with aplomb: He "responded that he found the information 'strange,' and that CASPERSEN would get to the bottom of it and call Individual-1 back." And then, instead of running to the airport like I would have, he really did call the investor back:

> CASPERSEN further stated that an analyst at Firm-2 [*Park Hill*] had provided CASPERSEN with contact information for Individual-3, and that things "don't look very good" for a colleague of CASPERSEN's.

That is some smooth deflection of blame. It didn't especially work: That was like three weeks ago, and Caspersen was arrested this past weekend, which is probably some sort of speed record for something like this unraveling. Caspersen had also allegedly tried to raise $50 million from another investor, but that investor more or less uttered the magic words ("legal due diligence"), and Caspersen vanished. This scheme was too silly to survive even the *mention* of due diligence.

The saddest part may be what Caspersen did with the money. A total of $27.5 million went into the SPV's bank account -- $25 million from the investor, and $2.5 million from, presumably, Caspersen himself. [7] Of that, $8.1 million allegedly went to a Park Hill bank account "to cover up an earlier unauthorized wire transfer of the same amount CASPERSEN had caused to be made to a bank account he controlled" rather than to the Park Hill bank account. The criminal complaint just sort of leaves that there. Caspersen ... apparently embezzled $8.1 million from Park Hill? Allegedly? Or, like, quasi-allegedly? Hintedly? And then paid back Park Hill before anyone noticed, by taking funds from a client? Best not to ask.

Caspersen allegedly blew most of the rest of the money -- $14.5 million or so -- trading options on the Standard & Poor's 500 Index, which is a last refuge of the desperate, the financial-markets equivalent of the roulette tables. Caspersen allegedly just made leveraged bets on whether the stock market would go up or down. He had no particular insight into whether the stock market would go up or down, and so, utterly predictably, those bets did poorly, and he lost almost all of the money he used to trade options.

Obviously if I managed to get clients to wire $25 million to my personal account, I would not sit around gambling on S&P 500 options; I'd be on the next plane to a non-extradition country with good beaches. [8] But Caspersen -- whose father was "immensely wealthy" and died in a somewhat mystifying suicide in 2009, leaving his sons with encumbered trust funds -- presumably was not doing all of this just to

fund a long vacation away from the U.S. justice system. It is pretty hard to know why he was doing it, really. (Caspersen's attorney declined Bloomberg News' request for comment on the charges.)

That's the thing about pulling off this sort of thing on a large scale. Sure, you can go around the country raising $10,000 at a time from unsophisticated retirees by promising them high risk-free returns and then stealing the money. But that is risky and exhausting. And to do this trade in size, $25 million at a time, just offering a fake 15 percent return isn't enough. You need to be convincing. You have to go to Princeton and Harvard Law School, you have to work for a decade at a fund that invests in secondary private-equity stakes, and then you need to work at another firm that advises and finances the trading of those stakes. You need to master the terminology and documentation, so that you can create and negotiate realistic-looking contracts for realistic-looking deals. You need to keep up with the market, so you know what legitimate deals are happening that you can pretend to be associated with. It helps to have many millions of dollars of your own wealth, so you can persuade potential investors that you'll be investing right alongside them. The bar for plausibility is high -- and once you are qualified to pull off a scam like this, what's the point of actually doing it?

1. You can vary the interest rate, and the liquidity terms, but the point is that the interest has to be pretty high, especially for a risk-free investment.

2. Strictly speaking two investors, though one decision-maker: An unidentified employee of an unidentified hedge fund invested $400,000 of his own money and $24.6 million from the fund's charitable foundation.

3. I realize that Bernie Madoff got many times that much money from sophisticated investors. But a Ponzi is different from a pure promise-yield-and-then-steal-everything scheme: Some Madoff investors really did make money, and the scheme lasted for years, which gave it an extra air of legitimacy.

4. That's from paragraph 10(b) of the criminal complaint:

> *On or about October 26, 2015, CASPERSEN and Individual-1 corresponded by telephone and email, and CASPERSEN made the following representations in connection with the supposed investment opportunity he had referenced two days earlier: (1) Firm-4 wanted to offer liquidity to investors (the "Original Investors") who had invested in a Firm-4 fund (the "Fund") in or about 2006; (ii) CASPERSEN, acting in his capacity as a partner at Firm-2, put Firm-4 in touch with Firm-1; (iii) Firm-1 agreed to "buy out" any of the Original Investors who wished to sell their positions in the fund; (iv) Firm-4 was concerned that Firm-1 did not have enough money to purchase the positions of all the Original Investors who may want to liquidate their positions in the Fund; (v) Firm-2 agreed to make an $80 million loan to Firm-1 (the "Loan"), in order to ensure that Firm-1 had enough money to buy out all of the Original Investors; (vi) Firm-1 created a special purpose vehicle (the "SPV") for the purpose of purchasing the positions of the Original Investors; (vii) CASPERSEN and Firm-2 were working on behalf of Firm-1 to solicit investors in the Loan; (viii) CASPERSEN had already raised $30 million from his family office and two other family offices toward the Loan; (ix) at some point after Firm-1 agreed to the Loan, it transpired that Firm-1 did not need the Loan in order to purchase the positions of the Original Investors; (x) however, because Firm-1 had already agreed to the Loan, Firm-1 was obligated to pay interest on the Loan, at an annual rate of 15%; (xi) because Firm-1 no longer needed the $80 million to buy out the Fund's Original Investors, according to CASPERSEN, "the plan" was "to keep the entire $80m at the SPV."*

Firm-4 "was a private equity firm, located in New York"; the SEC complaint makes it clear that it was Irving Place Capital, and the Fund was Irving Place Capital Partners III. (Caspersen's alleged fake SPV was called Irving Place III SPV, "so that others would deem it affiliated with Irving Place Capital Partners III SPV, a legitimate private equity fund not associated with Caspersen," and Irving Place really was raising money in an SPV to buy out its 2006 investors in July of 2015.)

Firm-1 was "a multi-national firm that invested in the private equity secondary market by acquiring portfolios of private equity interests from their original investors," and where Caspersen worked from 2003 through 2012 -- that is, Coller Capital, which really does seem to have been involved in buying out the Irving Place investors.

Firm-2 was "a multi-national private equity, investment banking, alternative asset management and financial services corporation" where Caspersen worked starting in 2013 -- that is, Park Hill, which was owned by Blackstone until it was spun out into PJT Capital on October 1, 2015.

5. Strictly, Caspersen's father's "private investment firm" managed $1 billion in 1998, "most of which represented the Caspersen fortune."

6. I have bracketed in the name here and in a few places below, because otherwise the complaint is unreadable.

7. I assume? Caspersen allegedly told the hedge fund firm that the SPV had raised $30 million from Caspersen's own family office and two others.

8. This is not, you know, advice, I guess?

*This column does not necessarily reflect the opinion of the editorial board or Bloomberg LP and its owners.*

To contact the author of this story:
Matt Levine at mlevine51@bloomberg.net

To contact the editor responsible for this story:
James Greiff at jgreiff@bloomberg.net

©2016 Bloomberg L.P. All Rights Reserved

y  VIDEO

o  AUDIO

Live TV   Schedules+Shows