# Reply Sentencing Submission On Behalf Of Andrew Caspersen

# 16-CR-00414-JSR

BRACEWELL

Texas
New York
Washington, DC
Connecticut
Seattle
Dubai
London

Paul Shechtman
Partner

+1.212.508.6107 Office
+1.800.404.3970 Fax

Paul.Shechtman@bracewelllaw.com

Bracewell LLP
1251 Avenue of the Americas
49th Floor
New York, New York
10020-1100

November 1, 2016

VIA ECF & MESSENGER

Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Re: United States v. Andrew Caspersen, 16-CR-00414-JSR

Dear Judge Rakoff:

There are portions of the government's sentencing submission with which no one could disagree: the losses caused by Mr. Caspersen were exceedingly large (G. Br. 11-14); he abused the trust of those closest to him (G. Br. 18-20); he risked the professional reputations of several of his victims (G. Br. 20-21); and he briefly involved a junior employee unwittingly in his fraud. (G. Br. 21-23). All of that is true and warrants punishment. But much of what the government argues in support of a Guidelines sentence (151 to 188 months) is hyperbolic or wrong. We address those points below.

1. The government writes that "imposition of a Guidelines sentence in this case would be consistent with sentences imposed on similarly situated defendants" and cites several cases in which lengthy sentences were imposed. (G. Br. 23-24). None of those "similarly situated defendants," however, suffered from a gambling disorder or any other mental infirmity. Moreover, gambling disorder aside, those defendants are not remotely similar to Mr.

BRACEWELL

November 1, 2016
Page 2

Caspersen. One of them, for example, is Mikhail Zemlyansky, who was sentenced to 15 years' imprisonment. In its sentencing submission to Judge Oetken, the government wrote this:

> For more than a dozen years, since at least the time he was 23 years old, Mikhail Zemlyansky engaged in numerous criminal endeavors, . . . ultimately operat[ing] a sprawling racketeering enterprise that committed securities fraud, health care fraud, illegal gambling, and money laundering. The defendant, who has never had a legitimate job, is a professional criminal who has stolen tens of millions of dollars from hundreds of innocent victims, many of whom lost their life savings . . . . Zemlyansky's criminal nature has shined even after his arrest. Since then, Zemlyansky violated his bail conditions, made false representations to the Court in a recent letter, failed to disclose his finances to the Court as requested by the Probation Office, and demonstrated no remorse or empathy to the victims of his crime. Rather, he has simply continued his fraudulent behavior -- now on the Court -- and has refused to accept responsibility for his crimes or even to accept the jury's verdict.

Gov't Sentencing Submission at 1, United States v. Zemlyansky, S18 12 CR 171 (JPO)(S.D.N.Y.), ECF No. 1881. Notably, Mr. Zemlyansky's Guidelines range was life. Id.

The other supposedly "similarly situated defendants" are also remorseless, professional criminals. See United States v. Eberhard, No. 03 CR 562 (RWS)(Eberhard, a celebrity investment advisor, stole millions from nearly 50 victims; used the proceeds to purchase an island in Nova Scotia and live a lavish lifestyle; paid "hush money" to prevent his co-conspirators from disclosing his criminal activities to law enforcement and his marital infidelities to his wife; and violated the court's freezing order by filing forged documents in an attempt to hide assets)(sentence, 160 months' imprisonment); United States v. Fiumano, No. 14 CR 518 (JFK)(Fiumano defrauded 30,000 customers of his mortgage modification business, many of them vulnerable victims, out of millions of dollars; following his trial conviction, he continued to engage in fraudulent activity)(guideline range, life; sentence, 16 years'

BRACEWELL

November 1, 2016
Page 3

imprisonment); United States v. Huggins, No. 13 CR 155 (SHS)(Huggins defrauded dozens of victims out of more than $8 million in an advance-fee investment scheme; used the proceeds to rent a $7,200 per month apartment on Sutton Place and pay for upkeep of his Mercedes Benz, clothes from expensive boutiques, and meals at high-end restaurants)(guideline range, 262-327 months; sentence, 120 months' imprisonment after a jury conviction). Pointing to sentences imposed in other cases is always parlous, but the sentences imposed on these men are not a basis for comparison.

   2. In seeking a Guidelines sentence, the government argues that "the criticisms that are leveled at the loss Guidelines -- namely that they overstate the true loss by including theoretical losses, or losses beyond the defendant's control -- do not apply in this case." (G. Br. 11). The principal criticism leveled at the loss table, however, is that it results in sentences that are "excessively harsh." Marvin Frankel, Sentencing Guidelines: A Need for Creative Collaboration, 101 Yale L. J. 2043, 2047 (1992); see also Frank O. Bowman III, A Proposal For Reconfiguring Federal Sentencing After Booker, 2005 U. Chi. Legal F. 149, 164 ("[a]t or near the root of virtually every serious criticism of the Guidelines is the concern that they are too harsh"); Anthony M. Kennedy, Speech at the American Bar Association Annual Meeting (Aug. 9, 2003)("the Federal Sentencing Guidelines should be revised downward").

   As the Court knows, the Guidelines have become increasingly harsh over time as there has been "no restraint on the gradual upward ratcheting of penalties made attractive by politics." Bowman, supra, at 173. To underscore the point, we set out the Guidelines range for Andrew Caspersen using the 1987, 1996, 2001, and 2016 tables:

BRACEWELL

November 1, 2016
Page 4

| Offense Conduct | 1987 | 1996 | 2001 | 2016 |
|---|---|---|---|---|
| Base Offense Level | 6 | 6 | 6 | 7 |
| Loss Amount | 11 | 16 | 22 | 22 |
| 10 or More Victims | 2 | 2 | 2 | 2 |
| Sophisticated Means | -- | -- | 2 | 2 |
| Broker and Dealer | -- | -- | -- | 4 |
| Abuse of Trust | 2 | 2 | 2 | -- |
| Acceptance of Responsibility | -2 | -3 | -3 | -3 |
| Total Offense Level | 19 | 23 | 31 | 34 |
| Guidelines Range | 30-37 months | 46-57 months | 108-135 months | 151-188 months |

To be sure, economic loss "should be a factor considered, among others, in fashioning an appropriate sentence," G. Br. 11, but rigid adherence to ever increasing Guidelines is not a recipe for a parsimonious sentence. See United States v. Dorvee, 616 F.3d 174, 182-83 (2d Cir. 2010)(under the "parsimony clause," "it is the sentencing court's duty to impose a sentence sufficient but not greater than necessary to comply with the [goals of sentencing]").[1]

---

[1] Contrary to the government's claim, we do not "overlook[] that fact that [the 2B1.1(b)(19)(A)] enhancement . . . applies to [Mr. Caspersen] because he is 'a person associated with a broker dealer.'" (G. Br. 16). Our point is that the enhancement is arbitrary like many other guideline enhancements. See United States v. Adelson, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2000)("the . . . Commission has never explained . . . why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic")(citation omitted). In 2002, Congress directed the Sentencing Commission to "consider the promulgation of new sentencing guidelines . . . to provide an enhancement for officers or directors of publicly traded corporations who commit fraud and related offenses." Policy Statements and Official Commentary at 9 (May 1, 2003). The Commission chose to go one step further and "expand[] the scope of this enhancement to cover . . . associated persons of a broker dealer" because they "are subject to heightened fiduciary duties imposed by securities law . . . similar to duties imposed on officers and directors of public traded corporations." Id. No showing that the defendant abused his position of trust (or even used it) is required for the enhancement to apply. Id. Suffice it to say, lawyers and trustees have heightened fiduciary duties, but their frauds do not call for a four-point enhancement.

BRACEWELL

November 1, 2016
Page 5

3. At one point in its submission, the government refers to "what [Mr. Caspersen] characterizes as his addiction to options trading." (G. Br. 12). Mr. Caspersen's addiction, however, is not his characterization but a fact: Andrew Caspersen was a pathological gambler who lost $60 million, including $23 million of his own money, trading options irrationally. See letter of Bruce Rosen ("[b]uying options in the way that he did may have satisfied some psychological need, but he was certain to lose all of his money").

No doubt recognizing that it cannot prevail on a "he-was-not-a-compulsive-gambler theory," the government argues that the Sentencing Commission was correct in rejecting compulsive gambling as a mitigating factor. It relies on Judge Kaplan's decision in United States v. Grillo, 2003 WL 22999219 (S.D.N.Y.). There, pre-Booker, Judge Kaplan took the position that a downward departure might be warranted in cases where reduced mental capacity results in "conduct constituting the criminal behavior" but not where it "merely results in conduct that creates the motive for the criminal behavior." Id. at *2. We take that to mean that a pathological gambler charged with illegal gambling might be entitled to a downward adjustment but one charged with a theft motivated by a gambling disorder would not be. Since gamblers, as opposed to bookmakers, are not prosecuted, if one followed Grillo, pathological gambling could never be a basis for a reduced sentence, no matter how significantly the defendant's capacity to control his behavior was impaired at the time of his crime.[2]

---

[2] See Penal Law §235.00(3)(exempting a "player" from criminal sanctions).

BRACEWELL

November 1, 2016
Page 6

> With due respect to Judge Kaplan, that cannot be the law. A defendant who steals to feed a severe gambling addiction should not be treated the same as a defendant who steals to buy an island in Nova Scotia. As this Court has written:
>
>> The law, for its part, is deeply concerned with mental states, particularly intentions. As Justice Oliver Wendell Holmes Jr. famously put it, "Even a dog distinguishes between being stumbled over and being kicked." Distinctions of intent frequently determine, as a matter of law, the difference between going to prison and going free.
>
> Jed S. Rakoff, Neuroscience and the Law: Don't Rush In, N.Y. Rev. of Books (May 12, 2016). Andrew Caspersen believed that he would win and repay his victims, even though he was sure to lose and kept gambling when he was temporarily $126 million ahead. Surely, such a mental state -- one that undermines the capacity to bring rationality to bear on one's conduct -- should matter to a sentencing judge.³

    4.    In the same vein, the government writes that "nothing . . . in the literature about gambling disorders . . . would support the notion that Caspersen had no choice but to commit fraud." (G. Br. 26). We accept the proposition that Mr. Caspersen's actions were not involuntarily, but the matter is more complex. To borrow language from Stephen J. Morse's oft-cited discussion of drug addiction, what we know is this:

---

³    In addition to Grillo, the government cites United States v. Gonzales, 155 F. Supp. 3d 1078, 1124 (D.N.M. 2016). There, the court wrote: "[i]n this case, gambling addiction is mentioned [in the PSR] but not discussed greatly, so the Court cannot on the record find it is present to an extraordinary degree." Id. at 1124. It is present in Mr. Caspersen's case to an extraordinary degree. The government also cites United States v. Marrero, 325 F. Supp. 2d 453, 457 (S.D.N.Y. 2004), where this Court departed downward only slightly because of the "sympathetic, even pitiable features of the defendant's . . . unsuccessful attempts to rid himself of his recurrent heroin addiction." Marrero was convicted of being a felon in possession of a loaded firearm with an obliterated serial number. His prior felony was possession of a loaded firearm. Marrero is not an apt comparison.

BRACEWELL

November 1, 2016
Page 7

> Some people who [gamble] over time develop a powerful, insistent desire to [continue to do so]. They engage in repetitive behavior that is termed compulsive because the addict reports that he feels compelled to ... continue[] despite markedly and often disastrously negative life effects .... Addiction undermines the addict's rational capacities [so] that avoiding the behavior is very difficult. In brief, the addict's strong desires -- the "go mechanism" -- make it very difficult for the addict to think straight [and] for the "stop mechanism" to work properly.

Stephen Morse, Voluntary Control of Behavior and Responsibility, The American Journal of Bioethics 7(1): 12-13 (2007); id. ("when the craving is the greatest, the addict can scarcely think about anything except [gambling] despite the many rational incentives not to [gamble]"). In short, "[t]he capacity to bring rationality to bear is a continuum concept," id., and a significantly impaired capacity for rationality should be a relevant datum at sentencing.

    5.  The government rightly observes that "the loss amount for purposes of the Guidelines ... does not account for the funds that Caspersen solicited but did not actually obtain (for example, . . . $50 million [in March 2016])." (G. Br. 13).[4] As the government notes, under the 2015 Amendments to the Sentencing Guidelines, intended loss "means the pecuniary harm that the defendant purposely sought to inflict." Application Note 3(A)(22)(emphasis added). In our discussions with the government, we argued that Mr. Caspersen's purpose was not to inflict harm on those from whom he sought unsuccessfully (or successfully) to obtain funds with which to gamble. Rather, he believed that his bets would eventually succeed and that he would repay what he had taken. The government accepted our argument then and does so begrudgingly now.

---

[4]  The $110 million "attempted fraud" figure that the government uses is vastly overstated. (G. Br. 14). In March 2016, for example, Mr. Caspersen sought $50 million from an investment firm, but hoped to use $25 million to repay Moore and then trade the remainder. The government counts that as $50 million. Moreover, Mr. Caspersen would often solicit several people simultaneously and walk away from the rest when one "invested."

# BRACEWELL

November 1, 2016
Page 8

See G. Br. 14 ("there are some facts that appear to support the argument that Caspersen did not intend to permanently deprive his victims of their funds"). That Mr. Caspersen's intent was not to steal from his victims (but to repay them from his winnings) distinguishes this case from virtually all other frauds. It also demonstrates the irrational thinking that characterizes a severe gambling disorder.

6. The government describes Mr. Caspersen as a "repeat offender" because he was "exposed for defrauding his mother and brother of $2.25 million" in 2012. (G. Br. 29). That is a peculiar notion of a repeat offender. Typically, one thinks of a repeat offender as a defendant with a prior criminal record who has not learned his lesson and reoffended after release. See Penn. ex rel Sullivan v. Ashe, 302 U.S. 51, 54-55 (1937)("[p]ersistence in crime and failure of earlier discipline effectively to deter or reform justify more drastic treatment"). To be sure, Mr. Caspersen squandered an opportunity to obtain much-needed treatment in 2012, but that does not make him a recidivist.[5]

7. The government writes that "the loss of [Mr. Caspersen's] professional licenses . . . and the felony convictions associated with his name are not factors this Court should

---

[5] Mr. Caspersen's failure to pursue treatment, while hardly estimable, is not uncommon. The authors of DSM-5 note that:

> There may be periods of heavy gambling and severe problems, times of total abstinence, and periods of nonproblematic gambling . . . . [S]ome individuals underestimate their vulnerability to develop gambling disorder or to return to gambling disorder following remission. When in a period of remission, they may incorrectly assume that they will have no problem regulating gambling and that they may gamble on some forms nonproblematically, only to experience a return to gambling disorder.

DSM-5, at 587.

## BRACEWELL

November 1, 2016
Page 9

take into account." (G. Br. 39). The Second Circuit, however, sees it differently: "[i]t is difficult to see how a court can properly calibrate a just punishment [for an offense] if it does not consider the collateral effects of a particular sentence." United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009). Here, those collateral effects include a bar from the securities industry, where Mr. Caspersen has made his living.

        8.        The government writes that Mr. Caspersen "used the [money] that he stole from his investors to pay off the mortgage and two home equity loans that he had taken out on his Manhattan co-op (a total of approximately $2 million . . . ); to make payments on a $3 million house in Bronxville (a total of approximately $1 million . . . ); [and] to make transfers to his wife, Christina (approximately $1.25 million . . . )." (G. Br. 6). The full story here is this: In October 2014, before the fraud began, Mr. Caspersen purchased a home in Bronxville for $3.2 million, making a $322,500 down payment. His wife's dream was to live in Bronxville near her parents, and he had a $4.25 million bonus ($2 million in cash), coming to him in late December. It seemed the perfect time to move. In February 2015, the Caspersens closed on the Bronxville property, putting down another $575,000 and obtaining a mortgage for the rest (approximately $2.4 million).[6] The $575,000 was "tainted money" because between late December 2014 (when he received his bonus) and February 2015 (when he closed on the Bronxville house), he had lost all of his bonus trading. Additionally, before approving the mortgage on the Bronxville house, the bank asked Mr. Caspersen to pay off his indebtedness on

---

[6]    Mr. Caspersen obtained the largest mortgage possible so that he could continue his gambling.

BRACEWELL

November 1, 2016
Page 10

the Manhattan co-op ($1.9 million) that he would be selling. He was able to delay that repayment until February 2016, when his trading account had ballooned to $106 million.

Thus, the government is correct that fraud proceeds were used to purchase the Bronxville house and that the indebtedness on the Manhattan co-op was paid from the gambling account. The story, however, is less about personal greed than about the serendipity of having contracted, pre-fraud, to buy a house that he could then legitimately afford and four months later finding himself with no choice but to use fraud proceeds or to back out of the sale. But for that serendipity, Mr. Caspersen would have left every penny in his trading account and gambled it away.[7]

The $1.25 million transfer to his wife occurred in March 2016, when Mr. Caspersen went to Florida and determined to commit suicide. He made no secret of the transfer, preparing a note for his victims that said this:

> I realize I am in no position to ask for favors at this point but I still must beg you to leave my wife and children out of this. I have transferred the majority of what little remaining money I have to my wife. That money [is] about 3 cents or so of your principal . . . . [P]lease know that I have at least paid a price [i.e., suicide]. And Christina, Jack and Grace will be paying a steeper price as they will have to live through the mess I created.

At the time, Mr. Caspersen had gambled away his $23 million inheritance, leaving none for his wife and children.

---

[7] It also bears note that in December 2015, Mr. Caspersen received a $1.4 million family distribution and immediately transferred it to his trading account, where it appreciated rapidly in the first six weeks of 2016. Saying that the repayment of the indebtedness on the co-op apartment in February 2016 is "traceable to fraud" is therefore a half truth.

9.  The government downplays the significance of the letters submitted on Mr. Caspersen's behalf, calling them "typical of the letters submitted by white collar criminals." (G. Br. 37). But the letters are atypical in two ways. First, many of the letter writers are close friends with Mr. Caspersen's victims and have chosen to support him nonetheless. See, e.g., letter of Brooke D. Horgan ("Andrew and I have many common friends, several of whom are victims of [his] crimes [and] it breaks my heart"); letter of John Burnham ("I realize that Andrew's actions have hurt a lot of people (many of whom are good friends of mine")); letter of Hunter Horgan ("[h]aving spent 5 years working closely with [two of Andrew's victim's], his crimes were particularly unsettling to me"); letter of C. Anderson Parker ("Andrew and I are both godparents to children [of one of Andrew's victims]").[8]

Second, several of the letter writers are Mr. Caspersen's victims.[9] The letter of Cameron MacRae, now a partner at Duane Morris, from whom Andrew took $1,000,000, is especially revealing:

> It seems inconceivable to me that a sophisticated person like Andrew would have wittingly engaged in the rudimentary and misguided trading patterns that Andrew pursued while under the influence of his addiction. Nor would the 'normal' persona of Andrew ever have taken such substantial funds from the family and friends he held most dear. Fed by alcohol, traumatized by dual unspeakable

---

[8]  Several of Andrew's friends disclose their own addictions in their letters, some for the first time publicly. See, e.g., letter of A. Ozzie Abaye ("I know what mental illness does to one [because] I suffered from a mental illness for over 7 years; the person suffering the illness can't see"); letter of John Burnham ("I have dealt successfully with some of the issues he is facing"); letter of Darren Boswell ("[a] little over 17 years ago, I hit my alcoholic bottom [and] had blown through every moral barrier").

[9]  See letters from: Barbara Caspersen, Cameron MacRae, Ann MacRae, Blackford Brauer, Frank Morgan, and Ari Benacerraf.

# BRACEWELL

November 1, 2016
Page 12

> tragedies, the gambling addiction overwhelmed his otherwise prudent and caring personality.

Letter of Cameron MacRae.[10] The government would have the Court believe that writing a letter was easy (G. Br. 38), but many of those who wrote on Mr. Caspersen's behalf would disagree.

      10.    Relatedly, the government writes that "with the exception of Caspersen's wife and a couple from St. Louis, not a single one of the letter writers was willing to come forward after Caspersen's arrest to co-sign his $5 million appearance bond or to post property [$50,000] to secure that bond." (G. Br. 38). The full story, however, points differently. As the Court knows, after his arrest, Mr. Caspersen was committed to New York Presbyterian Hospital where he was on suicide watch. A reluctance to co-sign the bond of a suicidal friend hardly evidences a lack of support. Moreover, the original bail package was unworkable because the Manhattan co-op could not easily be restrained. As a result, bail was modified on April 12, 2016, while Mr. Caspersen was still hospitalized, to a $5 million personal recognizance bond secured by the Bronxville house and one million dollars in cash. The Brauers, the "couple from St. Louis," signed the bond and posted the required cash, even though Mr. Caspersen had attempted to induce them to "invest" with him. In his letter to the Court, Mr. Brauer writes this:

> Suzy and I could choose to feel betrayed by Andrew's true intent, but we don't. Andrew's arrest in March exposed his mental illness and . . . we only feel the strongest sympathy for him . . . . While our assistance might seem unlikely under the circumstances, we would do it again based on Andrew's immediate actions to come clean and also based on the supportive feedback that we received from his wife Christina and his friends, including some victims we know.

---

[10]    Mr. MacRae's letter was sent directly to the Court but made available to us.

# BRACEWELL

November 1, 2016
Page 13

Letter of Blackford Brauer. In short, the government is wrong to suggest that the bail history should cause the Court to "read with a critical eye" the supporters' letters. (G. Br. 39).

11. At the end of its submission, the government writes that "[t]he public outcry over a man given all the breaks in life, beginning at birth, who cast them aside to repeatedly defraud his friends, family and colleagues, has been completely justified." (G. Br. 41). One is not quite sure what outcry the government is referring to, but presumably it is reflected in the presentment-day New York Post headline "Wall Street Exec Accused of Swindling Charity in $95 million Scam." Post 3/28/16. At that time, of course, no one knew that Mr. Caspersen suffered from a gambling disorder and had lost $23 million of his own money, and the press had received information from the government that made it seem that fraud proceeds were hidden. Id. ("there was a $9 million wire out of [Mr. Caspersen's] personal brokerage account on Dec. 4 that is still unaccounted for; we don't know where the money is"); Tr. 3/28/16 ("frankly we don't know where all of that money went . . . ; it may have been transferred abroad").[11] Not surprisingly, the press saw the case as yet another example of Wall Street greed and ran with it. Uninformed tabloid headlines, however, are not a basis for the informed sentencing decision that this Court must make.[12]

\* \* \*

---

[11] The $9 million transfer was from Fidelity Investments to Interactive Brokers, when Fidelity closed Mr. Caspersen's trading account; no money was transferred abroad.

[12] The government's reference to Mr. Caspersen's being given "all the breaks in life" is also problematic. Mr. Caspersen grew up privileged, but Cat's death and his father's suicide were not "breaks."

BRACEWELL

November 1, 2016
Page 14

That Mr. Caspersen committed a serious fraud is undeniable. He took advantage of those who expected the most from him and caused them substantial harm.[13] This case, however, has a tragic dimension that the government would have this Court ignore. An uncommonly good man felt compelled to continue gambling mindlessly "despite the markedly and disastrously negative effects it had on his life." Morse, supra, at 12-13. Mr. Caspersen's criminal conduct cannot be excused. But it should not result in a life-destructive sentence at a time he is finding his way back to health.

Respectfully submitted,

Bracewell LLP

Paul Shechtman
Margaret Lynaugh

PS/ML:wr

cc:   AUSA Christine Magdo

---

[13] The government writes that "[t]he defendant urges the Court to view the offense as having minimal impact on the victims." (G. Br. 18). No citation to our submission accompanies that sentence, and it is false. Mr. Caspersen knows that he caused significant harm to people who trusted him. Indeed, he said as much in the letter that he prepared in Florida, when he was unaware of the government's investigation and planning to commit suicide. See letter to creditors ("I am deeply ashamed of my scheme for many reasons, not least of which is the fact that my victims included family and friends").

#5342305.1